Tasha S. MAGGERT, Plaintiff–Appellant,

v.

Craig A. HANKS, et al., Defendants–Appellees.

No. 97–1651.

United States Court of Appeals,
Seventh Circuit.

Submitted Oct. 28, 1997.

Decided Dec. 9, 1997.

Tasha S. Maggert (submitted), Carlisle, IN, Plaintiff–Appellant pro se.

Before POSNER, Chief Judge, and BAUER and EVANS, Circuit Judges.

POSNER, Chief Judge.

A prisoner appeals from the dismissal of a suit in which he claims that the prison's failure to give him estrogen therapy for a psychiatric condition known technically as gender dysphoria and more popularly as transsexualism is a form of cruel and unusual punishment. A psychiatrist hired by the

prison on a contract basis refused to prescribe estrogen for the prisoner, Maggert, instead recommending that he continue to see the prison psychologist for counseling.

■ The judge was clearly right to dismiss the suit. The psychiatrist does not believe that Maggert suffers from gender dysphoria, although he acknowledges that Maggert's "sexual identity is polymorphous and his sexual aims ambiguous." Maggert has not submitted a contrary affidavit by a qualified expert and so has not created a genuine issue of material fact that would keep this case alive.

■ But there is a broader issue, having to do with the significance of gender dysphoria in prisoners' civil rights litigation, that we want to address. Although gender dysphoria is a rare condition, it has been invoked in enough prisoner cases to give rise to the term "the jurisprudence of transsexualism." Debra Sherman Tedeschi, "The Predicament of the Transsexual Prisoner," 5 *Temple Polit. & Civ. Rts. L.Rev.* 27 (1995). The problematic character of this jurisprudence arises from the following considerations. The Eighth Amendment has been interpreted to forbid prisons to ignore the serious medical, including psychiatric, afflictions of prisoners. E.g., *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976); *Farmer v. Haas*, 990 F.2d 319, 322 (7th Cir.1993); *Belcher v. City of Foley*, 30 F.3d 1390, 1396 (11th Cir.1994); *Langley v. Coughlin*, 888 F.2d 252, 254 (2d Cir.1989). Gender dysphoria—the condition in which a person believes that he is imprisoned in a body of the wrong sex, that though biologically a male (the more common form of the condition) he is "really" a female—is a serious psychiatric disorder, as we know because the people afflicted by it will go to great lengths to cure it if they can afford the cure. The cure for the male transsexual consists not of psychiatric treatment designed to make the patient content with his biological sexual identity—that doesn't work—but of estrogen therapy designed to create the secondary sexual characteristics of a woman followed by the surgical removal of the genitals and the construction of a vagina-substitute out of penile tissue. American Medical Association, *Encyclopedia of Medicine* 896 (1989); 4B James G. Zimmerly, *Lawyers Medical Cyclopedia of Personal Injuries and Allied Specialties* § 31.33b (3d ed.1992); see also discussion and references in *Meriwether v. Faulkner*, 821 F.2d 408, 411–13 (7th Cir.1987). Someone eager to undergo this mutilation is plainly suffering from a profound psychiatric disorder.

Does it follow that prisons have a duty to administer (if the prisoner requests it) the standard cure to a prisoner who unlike Maggert is diagnosed as a genuine transsexual? The cases do not answer "yes," but they make the question easier than it really is by saying that the choice of treatment is up to the prison. *Id.* at 414; *Brown v. Zavaras*, 63 F.3d 967, 970 (10th Cir.1995); *White v. Farrier*, 849 F.2d 322, 327–28 (8th Cir.1988); *Supre v. Ricketts*, 792 F.2d 958, 963 (10th Cir.1986). The implication is that less drastic (and, not incidentally, less costly) treatments are available for this condition. However, we have found only one report of successful nonradical treatment of gender dysphoria. B.K. Puri & I. Singh, "The Successful Treatment of a Gender Dysphoric Patient with Pimozide," 30 *Australian & N. Zealand J. Psych.* 422 (1996).

■ Yet it does not follow that the prisons have a duty to authorize the hormonal and surgical procedures that in most cases at least would be necessary to "cure" a prisoner's gender dysphoria. Those procedures are protracted and expensive. Even after a person is diagnosed as having gender dysphoria, treatment protocols require that he complete at least three months of psychotherapy before beginning to take estrogen, and that before undergoing the surgical last stage of the treatment he live for two or three years in the "gender of orientation" while taking estrogen; during this period nongenital surgeries and electrolysis are performed as part of the treatment. A prison is not required by the Eighth Amendment to give a prisoner medical care that is as good as he would receive if he were a free person, let alone an affluent free person. See *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir.1990). He is entitled only to minimum care. *Hudson v. McMillian*, 503 U.S. 1, 9,

112 S.Ct. 995, 1000, 117 L.Ed.2d 156 (1992); *Wellman v. Faulkner*, 715 F.2d 269, 271 (7th Cir.1983); *Harris v. Thigpen*, 941 F.2d 1495, 1504 (11th Cir.1991); *Jackson v. Fair*, 846 F.2d 811, 817 (1st Cir.1988). Although some cases hold that states cannot categorically exclude sex-change operations from Medicaid coverage, *Pinneke v. Preisser*, 623 F.2d 546, 549–50 (8th Cir.1980); *Doe v. State*, 257 N.W.2d 816 (Minn.1977); *J.D. v. Lackner*, 80 Cal.App.3d 90, 145 Cal.Rptr. 570 (1 Dist. 1978); *G.B. v. Lackner*, 80 Cal.App.3d 64, 145 Cal.Rptr. 555 (1 Dist.1978), many state Medicaid statutes contain a blanket exclusion, e.g., Ill. Admin. Code title 89, § 140.6(1); 55 Pa.Code § 1163.59(a)(1); Alaska Admin. Code title 7, § 43.385(a)(1), and we imagine that as a practical matter it is extremely difficult to obtain Medicaid reimbursement for such a procedure. According to a recent article, Minnesota is the only state in which Medicaid currently pays for sex-change operations. Joyce Price, "Minnesota Using Medicaid Funding to Pay for Sex–Change Operations," *Washington Times*, Feb. 4, 1996, p. A4. Medicare does not pay for such operations, *Medicare Program: National Coverage Decisions*, 54 Fed.Reg. 34555, 34572 (Aug. 21, 1989); nor do standard health plans, see "Transsexual Fights for Disability Insurance Coverage," *Seattle Post–Intelligencer*, July 15, 1997, p. B2, or CHAMPUS (the "Civilian Health and Medical Program of the Uniformed Services"), 32 C.F.R. § 199.4(e)(7). In general, then, you have to pay for the treatment yourself; and the total cost, which can easily reach $100,000, puts the treatment beyond the reach of a person of average wealth. Withholding from a prisoner an esoteric medical treatment that only the wealthy can afford does not strike us as a form of cruel and unusual punishment. It is not unusual; and we cannot see what is cruel about refusing a benefit to a person who could not have obtained the benefit if he had refrained from committing crimes. We do not want transsexuals committing crimes because it is the only route to obtaining a cure.

It is not the cost per se that drives this conclusion. For life-threatening or crippling conditions, Medicaid and other public-aid, insurance, and charity programs authorize treatments that often exceed $100,000. Gender dysphoria is not, at least not yet, generally considered a severe enough condition to warrant expensive treatment at the expense of others than the person suffering from it. That being so, making the treatment a constitutional duty of prisons would give prisoners a degree of medical care that they could not obtain if they obeyed the law.

■ We conclude that, except in special circumstances that we do not at present foresee, the Eighth Amendment does not entitle a prison inmate to curative treatment for his gender dysphoria. Of course, as the cases have already established, he is entitled to be protected, by assignment to protective custody or otherwise, from harassment by prisoners who wish to use him as a sexual plaything, provided that the danger is both acute and known to the authorities. E.g., *Farmer v. Brennan*, 511 U.S. 825, 833–34, 114 S.Ct. 1970, 1976–77, 128 L.Ed.2d 811 (1994).

AFFIRMED.