In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 10-2339 & 10-2466

ANDREA FIELDS, et al.,

*Plaintiffs-Appellees*,
*Cross-Appellants*,

*v.*

JUDY P. SMITH, et al.,

*Defendants-Appellants*,
*Cross-Appellees*.

Appeals from the United States District Court
for the Eastern District of Wisconsin.
No. 2:06-cv-00112-CNC—**Charles N. Clevert, Jr.**, *Chief Judge*.

ARGUED FEBRUARY 7, 2011—DECIDED AUGUST 5, 2011

Before ROVNER and WOOD, *Circuit Judges*, and
GOTTSCHALL, *District Judge.**

GOTTSCHALL, *District Judge.* In this appeal, we are
asked to review the decision of the district court inval-
idating a Wisconsin state statute which prohibits the

---

* The Honorable Joan B. Gottschall, United States District
Judge for the Northern District of Illinois, sitting by designation.

Wisconsin Department of Corrections ("DOC") from providing transgender inmates with certain medical treatments.[1] The Inmate Sex Change Prevention Act ("Act 105") provides in relevant part:

>   (a) In this subsection:
>
>> 1. "Hormonal therapy" means the use of hormones to stimulate the development or alteration of a person's sexual characteristics in order to alter the person's physical appearance so that the person appears more like the opposite gender.
>>
>> 2. "Sexual reassignment surgery" means surgical procedures to alter a person's physical appearance so that the person appears more like the opposite gender.
>>
>> (b) The [Wisconsin Department of Corrections] may not authorize the payment of any funds or the use of any resources of this state or the payment of any federal funds passing through the state treasury to provide or to facilitate the provision of hormonal therapy or sexual reassignment surgery . . . .

2005 Wis. Act 105, codified at Wis. Stat. § 302.386(5m) (2010). The district court concluded that this provision violates the Eighth Amendment's ban on cruel and unusual punishment and the Fourteenth Amendment's

---

[1]  A group of medical and mental health professionals sought leave from the court to submit a brief as *amici curiae*. The motion is granted.

Equal Protection Clause. Defendants, various DOC officials, now appeal.

## I

A number of DOC inmates filed this lawsuit as a putative class action in the Eastern District of Wisconsin on behalf of all current and future DOC inmates with "strong, persistent cross-gender identification." The district court denied plaintiffs' motion for class certification, but permitted the case to proceed to trial on the individual claims of three plaintiffs.

The three plaintiffs—Andrea Fields, Matthew Davison (also known as Jessica Davison), and Vankemah Moaton—are male-to-female transsexuals. According to stipulated facts, each has been diagnosed with Gender Identity Disorder ("GID"). GID is classified as a psychiatric disorder in the DSM-IV-TR, the current edition of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders. Individuals with GID identify strongly with a gender that does not match their physical sex characteristics. The condition is associated with severe psychological distress. Prior to the passage of Act 105, each of the plaintiffs had been diagnosed by DOC physicians with GID and had been prescribed hormones.

After a trial in which both sides presented expert testimony about GID, its treatment, and its potential effects on prison security, the district court ruled in favor of plaintiffs. The court ruled that Act 105 was unconstitu-

tional, both as applied and on its face, under the Eighth and Fourteenth Amendments. The district court ultimately issued an injunction barring defendants from enforcing Act 105. We need not recount all the evidence presented at trial—the district court's 40-page opinion thoroughly describes the trial testimony, *see Fields v. Smith*, 712 F. Supp. 2d 830 (E.D. Wis. 2010)—but a brief review of the district court's critical factual findings is warranted.

The district court credited much of the testimony from plaintiffs' witnesses, including three experts in the treatment of GID. Plaintiffs' experts testified that, collectively, they had treated thousands of patients with GID and published numerous peer-reviewed articles and books on the subject. One expert had specifically studied transsexuals in the correctional setting. These experts explained that GID can cause an acute sense that a person's body does not match his or her gender identity. Even before seeking treatment and from an early age, patients will experience this dysphoria and may attempt to conform their appearance and behavior to the gender with which they identify.

The feelings of dysphoria can vary in intensity. Some patients are able to manage the discomfort, while others become unable to function without taking steps to correct the disorder. A person with GID often experiences severe anxiety, depression, and other psychological disorders. Those with GID may attempt to commit suicide or to mutilate their own genitals.

The accepted standards of care dictate a gradual approach to treatment beginning with psychotherapy and real life experience living as the opposite gender. For some number of patients, this treatment will be effective in controlling feelings of dysphoria. When the condition is more severe, a doctor can prescribe hormones, which have the effect of relieving the psychological distress. Hormones also have physical effects on the body. For example, males may experience breast development, relocation of body fat, and softening of the skin. In the most severe cases, sexual reassignment surgery may be appropriate. But often the use of hormones will be sufficient to control the disorder.

When hormones are withdrawn from a patient who has been receiving hormone treatment, severe complications may arise. The dysphoria and associated psychological symptoms may resurface in more acute form. In addition, there may be severe physical effects such as muscle wasting, high blood pressure, and neurological complications. All three plaintiffs in this case experienced some of these effects when DOC doctors discontinued their treatment following the passage of Act 105.[2]

---

[2] Defendants began reducing plaintiffs' hormone levels on January 12, 2006; on January 27, 2006, the district court granted a preliminary injunction barring defendants from continuing to withdraw plaintiffs' hormone therapy and ordering defendants to return plaintiffs to their previous hormone levels.

Plaintiffs also called Dr. David Burnett, the DOC's Medical Director, and Dr. Kevin Kallas, the DOC Mental Health Director, to testify at trial. These officials explained that, prior to the enactment of Act 105, hormone therapy had been prescribed to some DOC inmates, including plaintiffs. DOC policies did not permit inmates to receive sex reassignment surgery. Drs. Kallas and Burnett served on a committee of DOC officials that evaluated whether hormone therapy was medically necessary for any particular inmate. Inmates are not permitted to seek any medical treatment outside the prison, regardless of their ability to pay. The doctors testified that they could think of no other state law or policy, besides Act 105, that prohibits prison doctors from providing inmates with medically necessary treatment.

## II

We evaluate both the district court's grant of injunctive relief and the scope of that relief for abuse of discretion. *Knapp v. Nw. Univ.*, 101 F.3d 473, 478 (7th Cir. 1996); *see Brown v. Plata*, 131 S.Ct. 1910, 1957 (2011) (Scalia, J., dissenting) (noting that under the Prison Litigation Reform Act ("PLRA"), "when a district court enters a new decree with new benchmarks, the selection of those benchmarks is . . . reviewed under a deferential, abuse-of-discretion standard of review"); *Russian Media Group, LLC v. Cable Am., Inc.*, 598 F.3d 302, 307 (7th Cir. 2010) ("[T]he appropriate scope of the injunction is left to the district court's sound discretion."); *Thomas v. Bryant*, 614 F.3d 1288, 1321

(11th Cir. 2010) (applying abuse of discretion standard to evaluate scope of injunction in conformity with PLRA); *Crawford v. Clarke*, 578 F.3d 39, 43 (1st Cir. 2009) (holding that district court did not abuse its discretion in awarding system-wide relief under the PLRA). The court's factual findings are reviewed for clear error, and any legal determinations are reviewed de novo. *Knapp*, 101 F.3d at 478.

"Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when they display 'deliberate indifference to serious medical needs of prisoners.'" *Greeno v. Daley*, 414 F.3d 645, 652-53 (7th Cir. 2005) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). In this case, the district court held that plaintiffs suffered from a serious medical need, namely GID, and that defendants acted with deliberate indifference in that defendants knew of the serious medical need but refused to provide hormone therapy because of Act 105. Defendants do not challenge the district court's holding that GID is a serious medical condition. They contend that Act 105 is constitutional because the state legislature has the power to prohibit certain medical treatments when other treatment options are available. And defendants argue that Act 105 is justified by a legitimate need to ensure security in state prisons.

Defendants rely primarily on two Seventh Circuit decisions which addressed constitutional challenges to refusals to provide treatment for gender dysphoria or transsexualism. Over twenty-four years ago, in *Meriwether v. Faulkner*, 821 F.2d 408 (7th Cir. 1987), this court reversed the dismissal of a complaint which alleged that

the plaintiff, who had previously been taking hormones, was denied all treatment for her gender dysphoria upon entering prison. The court held that the plaintiff stated a claim that transsexualism was a serious medical need and that prison officials acted with deliberate indifference in refusing all treatment. The court noted in dicta that "[i]t is important to emphasize, however, that she does not have a right to any particular type of treatment, such as estrogen therapy which appears to be the focus of her complaint." *Id.* at 413.

Ten years later, in *Maggert v. Hanks*, 131 F.3d 670 (7th Cir. 1997), this court, in two brief paragraphs, upheld a decision granting summary judgment on a similar deliberate indifference claim where the plaintiff did not come forward with any evidence to rebut defendants' expert witness, who testified that plaintiff did not suffer from gender dysphoria. The court's opinion proceeded to address "a broader issue, having to do with the significance of gender dysphoria in prisoners' civil rights litigation." *Id.* at 671. The court commented, again in dicta, that the Eighth Amendment does not require the provision of "esoteric" treatments like hormone therapy and sexual reassignment surgery which are "protracted and expensive" and not generally available to those who are not affluent. *Id.* at 671-72. A prison would be required to provide some treatment for gender dysphoria, but not necessarily "curative" treatment because the Eighth Amendment requires only minimum health care for prison inmates. *Id.* at 672.

The court's discussion of hormone therapy and sex reassignment surgery in these two cases was based on certain empirical assumptions—that the cost of these treatments is high and that adequate alternatives exist. More than a decade after this court's decision in *Maggert*, the district court in this case held a trial in which these empirical assumptions were put to the test. At trial, defendants stipulated that the cost of providing hormone therapy is between $300 and $1,000 per inmate per year. The district court compared this cost to the cost of a common antipsychotic drug used to treat many DOC inmates. In 2004, DOC paid a total of $2,300 for hormones for two inmates. That same year, DOC paid $2.5 million to provide inmates with quetiapine, an antipsychotic drug which costs more than $2,500 per inmate per year. Sex reassignment surgery is significantly more expensive, costing approximately $20,000. However, other significant surgeries may be more expensive. In 2005, DOC paid $37,244 for one coronary bypass surgery and $32,897 for one kidney transplant surgery. The district court concluded that DOC might actually incur greater costs by refusing to provide hormones, since inmates with GID might require other expensive treatments or enhanced monitoring by prison security.[3] *Fields*, 712 F. Supp. 2d at 863. In fact, at oral argument before this court, counsel for defendants disclaimed any argument that Act 105 is justified by cost

---

[3] Plaintiff Moaton, for example, experienced suicidal ideation after DOC officials began withdrawing hormone treatments. *Fields*, 712 F. Supp. 2d at 835.

savings. *See* Oral Argument at 15:18, *Field v. Smith*, Nos. 10-2339 and 10-2466, *available at* http://www.ca7.uscourts.gov/fdocs/docs.fwx?dname=arg.

More importantly here, defendants did not produce any evidence that another treatment could be an adequate replacement for hormone therapy. Plaintiffs' witnesses repeatedly made the point that, for certain patients with GID, hormone therapy is the only treatment that reduces dysphoria and can prevent the severe emotional and physical harms associated with it. Although DOC can provide psychotherapy as well as antipsychotics and antidepressants, defendants failed to present evidence rebutting the testimony that these treatments do nothing to treat the underlying disorder. Defendants called their own expert to speak about GID: Dr. Daniel Claiborn, a Ph.D. in psychology who estimated he has treated only about fifty clients with GID over a period of twenty years in his private practice. Dr. Claiborn provided no testimony about the appropriate treatment for plaintiffs. He offered his opinion that GID is not properly characterized as a psychological disorder because a person with GID does not typically suffer from an impairment in psychological functions. However, defendants have now conceded that GID is a serious medical condition. Dr. Claiborn's testimony does not support the assertion that plaintiffs can be effectively treated without hormones.

It is well established that the Constitution's ban on cruel and unusual punishment does not permit a state to deny effective treatment for the serious medical needs of

prisoners. The Supreme Court articulated this principle in *Estelle v. Gamble*:

> An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical "torture or a lingering death," the evils of most immediate concern to the drafters of the Amendment. In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose. . . . We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain," proscribed by the Eighth Amendment.

429 U.S. at 103-04 (citations omitted). Surely, had the Wisconsin legislature passed a law that DOC inmates with cancer must be treated only with therapy and pain killers, this court would have no trouble concluding that the law was unconstitutional. Refusing to provide effective treatment for a serious medical condition serves no valid penological purpose and amounts to torture. *Id.*; *see also Roe v. Elyea*, 631 F.3d 843, 861-63 (7th Cir. 2011) (upholding verdict for plaintiff that prison policy on treatment of Hepatitis C was deliberately indifferent); *Kelley v. McGinnis*, 899 F.2d 612, 616 (7th Cir. 1990) (reversing dismissal of complaint alleging that prison provided inadequate treatment for inmate's chronic foot problems). Although Act 105 permits DOC to provide plaintiffs with *some* treatment, the evidence at

trial indicated that plaintiffs could not be effectively treated without hormones.

Defendants point to the Supreme Court's decision in *Gonzales v. Carhart*, 550 U.S. 124 (2007), for the proposition that a legislature may constitutionally limit the discretion of physicians by outlawing a particular medical procedure. In *Carhart*, the Court upheld the constitutionality of the Partial-Birth Abortion Ban Act of 2003 which outlawed a particular procedure used to perform late-term abortions. The Court noted the existence of "medical uncertainty" regarding whether the banned procedure was more dangerous than alternative procedures. *Id.* at 163-64. Because safe abortion alternatives to the prohibited procedure appeared to exist, the court turned away the facial challenge to the law. *Id.* at 164.

*Carhart* is not helpful to defendants in this case because they did not present any medical evidence that alternative treatments for GID are effective. As defendants point out, some medical uncertainty remains as to the causes of GID, but there was no evidence of uncertainty about the efficacy of hormone therapy as a treatment. Just as the legislature cannot outlaw all effective cancer treatments for prison inmates, it cannot outlaw the only effective treatment for a serious condition like GID.

Defendants argue that even if application of Act 105 to plaintiffs violates the Eighth Amendment, the district court erred in sustaining a facial challenge to the law. Act 105 bans treatment to all prisoners, even those for

whom hormones and surgery are not medically necessary. A facial challenge to the constitutionality of a law can succeed only where plaintiffs can "'establish that no set of circumstances exists under which the Act would be valid.'" *Doe v. Heck*, 327 F.3d 492, 528 (7th Cir. 2003) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Nonetheless, "[t]he proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 894 (1992). The district court, in this case, found that DOC doctors prescribe hormones only when the treatment is medically necessary. *Fields*, 712 F. Supp. 2d at 866. Thus, the court correctly concluded that Act 105 is irrelevant to inmates who are not diagnosed with severe GID and in medical need of hormones, and any application of Act 105 would necessarily violate the Eighth Amendment.

Defendants have also argued that Act 105 is justified by the state's interest in preserving prison security. Defendants' security expert, Eugene Atherton, testified that more feminine male inmates become targets for sexual assault in prisons. Because hormone therapy alters a person's secondary sex characteristics such as breast size and body hair, defendants argue that hormones feminize inmates and make them more susceptible to inciting prison violence. But the district court rejected this argument, noting that the evidence showed transgender inmates may be targets for violence even without hormones. Atherton himself, in his deposition, testified that it would be "an incredible stretch" to conclude that banning the use of hormones could prevent

sexual assaults. *Id.* at 868. In the Colorado Department of Corrections, where Atherton worked for many years, the state had a policy of providing necessary hormones to inmates with GID. Atherton testified that this policy was reasonable and had been implemented effectively in Colorado.

Defendants cite *Whitley v. Albers* for the proposition that "'[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'" 475 U.S. 312, 321-22 (1986) (quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)). But deference does not extend to "actions taken in bad faith and for no legitimate purpose." *Id.* at 322. The district court did not abuse its discretion in concluding that defendants' evidence failed to establish any security benefits associated with a ban on hormone therapy. The legislators who approved Act 105 may have honestly believed they were improving prison security, but courts "retain[ ] an independent constitutional duty to review factual findings where constitutional rights are at stake." *Carhart*, 550 U.S. at 165.

Finally, defendants contend that the district court's injunction violates the PLRA, 18 U.S.C. § 3626(a), because it enjoins Act 105 in its entirety.[4] They argue that

---

[4] The PLRA provides, in part:

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct
>
> (continued...)

plaintiffs have never demonstrated a need for sex reassignment surgery, which the law also prohibits. For their part, plaintiffs argue that defendants waived this argument by failing to raise it before the district court. In fact, the record establishes an admission, not a waiver. On June 9, 2010 plaintiffs requested that the district court supplement its findings relating to the PLRA's so-called "need-narrowness-intrusiveness" standard. At a subsequent status conference, the court asked defendants' counsel not once, but twice, "whether or not the Defense believes the order as tendered . . . is as narrow as is required"; counsel replied that it was. (*See* Pls.' App. 19.) As a practical matter, then, defendants are precluded from making this argument now.

Regardless, the district court's orders establish that the court evaluated the record as a whole and identified evidence that fully supports the scope of the injunctive relief granted. *See Armstrong v. Schwarzenegger*, 622 F.3d

---

(...continued)

> the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

18 U.S.C. § 3626(a)(1)(A).

1058, 1070 (9th Cir. 2010) ("[T]he language of the PLRA does not suggest that Congress intended a provision-by-provision explanation of a district court's findings . . . . [T]he statutory language [means] that the courts must do what they have always done when determining the appropriateness of the relief ordered: consider the order as a whole."); *Gomez v. Vernon*, 255 F.3d 1118, 1129 (9th Cir. 2001) (the PLRA "has not substantially changed the threshold findings and standards required to justify an injunction"); *Smith v. Ark. Dep't of Corr.*, 103 F.3d 637, 647 (8th Cir. 1996) (same); *Williams v. Edwards*, 87 F.3d 126, 133 n. 21 (5th Cir. 1996) (same). In the district court's May 13, 2010 memorandum order, the court expressly addressed both hormone therapy and sex reassignment surgery. There, the court stated that:

> The defendants acknowledge that Act 105 removes even the consideration of hormones or surgery for inmates with gender issues and that the DOC halted evaluations of inmates with GID for possible administration of hormone therapy because of the Act. However, in determining whether a facial challenge to Act 105 may succeed here, the defendants submit that the court must take into account all inmates in DOC custody for whom hormone therapy or sexual reassignment surgery would be considered as treatment for gender issues. If that is done, they maintain that there are circumstances where Act 105 may be applied without violating the Constitution, and that, as a result, the plaintiffs' facial challenge

to the law must fail. Unfortunately, the defendants do not support this point.

. . . .

In certain cases, as with the plaintiffs in this case, the effect of Act 105 is to withdraw an ongoing course of treatment, the result of which has negative medical consequences. In other cases, the effect of Act 105 is to prevent DOC medical personnel from evaluating inmates for treatment because such evaluation would be futile in light of Act 105's ban on the treatment they may determine to be medically necessary for the health of the inmate.

. . . .

In this case, Act 105 bars the use of hormones "to stimulate the development or alteration of a person's sexual characteristics in order to alter the person's physical appearance so that the person appears more like the opposite gender," as well as sexual reassignment surgery "to alter a person's physical appearance so that the person appears more like the opposite gender." Wis. Stat. § 302.386(5m)(a). The statute applies irrespective of an inmate's serious medical need or the DOC's clinical judgment if at the outset of treatment, it is possible that the inmate will develop the sexual characteristics of the opposite gender. The reach of this statute is sweeping inasmuch as it is applicable to any inmate who is now in the custody of the DOC or may at any time be in the custody of the DOC, as well as any medical profes-

> sional who may consider hormone therapy or gender reassignment as necessary treatment for an inmate.

*Fields*, 712 F. Supp. 2d at 865-67. The district court's June 22, 2010 "additional findings" further support its conclusion that the statute is facially invalid. There, the court found that the injunction was "narrowly tailored in that enjoining the enforcement of [Act 105] prohibits only unconstitutional applications of the statute[,] which this court has found to be unconstitutional any time it is applied," and the injunction extended no further than necessary to correct the Eighth Amendment violation because "enjoining all applications of [Act 105] is necessary to prevent constitutional violations." The district court also specifically referenced its prior finding that the constitutional violation stemmed from "removing 'even the consideration of hormones or surgery.'" (*See* App. 174-75.) We agree. Evaluating the record as a whole, the district court did not abuse its discretion in enjoining the entirety of Act 105.

Having determined that the district court properly held that Act 105 violates the Eighth Amendment, both on its face and as applied to plaintiffs, we need not address the district court's alternate holding that the law violates the Equal Protection Clause. Plaintiffs have asserted a conditional cross-appeal of the district court's denial of class certification. But because we have upheld the district court's injunction, we also do not address the cross-appeal.

### III

The judgment of the district court is affirmed.