In the

# United States Court of Appeals

### For the Seventh Circuit

No. 16-3350

LISA MITCHELL,

*Plaintiff-Appellant,*

*v.*

KEVIN KALLAS, *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 15-cv-108 — **William M. Conley**, *Judge.*

ARGUED JANUARY 10, 2018 — DECIDED JULY 10, 2018

Before WOOD, *Chief Judge*, HAMILTON, *Circuit Judge*, and
BUCKLO, *District Judge*.[*]

WOOD, *Chief Judge*. Lisa Mitchell is a transgender person
who has identified as a woman her entire life. After an arrest
in Wisconsin, officials from the state's Department of Correc-
tions ("DOC") repeatedly prevented Mitchell from obtaining

---

[*]Of the Northern District of Illinois, sitting by designation.

access to the treatments she needed to express her gender identity. It took DOC over a year to evaluate Mitchell's candidacy for hormone therapy, and even then, nothing happened. Instead, DOC refused to provide Mitchell with the treatment its own expert recommended, on the ground that Mitchell was within a month of release from the prison. Although DOC's Mental Health Director, Dr. Kevin Kallas, encouraged Mitchell to find a community provider to prescribe her hormones, DOC parole officers prevented Mitchell from following this advice. Still under state custody, the terms of Mitchell's parole actually prohibited her from taking hormones or dressing as a woman.

Mitchell sued, contending that the prison doctors and the parole officers violated her constitutional rights. It is well established that persons in criminal custody are entirely dependent on the state for their medical care. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). Prison officials thus have a constitutional duty to provide inmates with the care they require for their serious medical needs. Prison staff cannot bide their time and wait for an inmate's sentence to expire before providing necessary treatments. This affirmative obligation ends when imprisonment does, but state officials may not block a parolee from independently obtaining health care. The only limitation is that the condition be serious enough to trigger constitutional protection; otherwise the nature of the disorder is irrelevant. Because the district court prematurely rejected some of Mitchell's claims, we reverse in part.

## I

In 2008, Mitchell received a diagnosis of gender dysphoria. A few years later, she was convicted of a crime and sent to Wisconsin's Columbia Correctional Institution on October

11, 2011, to serve her sentence. On November 25, 2011, Mitchell asked for hormone treatment. Her request initiated a multistep process that DOC outlined in its then-new policy on Health Care Treatment of Gender Identity Disorder. That policy was first implemented on December 19, 2011. Step one under the policy required Mitchell's clinician to conduct a preliminary assessment. She did so, producing a written report about Mitchell on February 10, 2012. Next, the Gender Dysphoria Committee reviewed the report and decided to refer Mitchell's request for hormone therapy to its outside consultant, Cynthia Osborne. Osborne is a social worker and assistant professor at Johns Hopkins University, in Maryland; she specializes in providing gender-dysphoria evaluations. Since Osborne visited the Wisconsin facilities roughly every two months, Dr. Kallas informed Mitchell that she would meet with Osborne in April. That interview did not occur until May 22, 2012, however, nearly six months after Mitchell's initial request for care.

During the months leading up to and following the interview, Mitchell repeatedly inquired about her health care request. She asked Dr. Dawn Laurent, the prison's Psychological Services Unit Supervisor, for an update on April 8, 2012. Dr. Laurent did not respond. Instead, Mitchell's assigned clinician wrote back, promising to follow up. Mitchell also wrote letters to Dr. Kallas. In his October 8 reply, Dr. Kallas informed Mitchell that Osborne's report was "nearly complete" and should be finished "in a matter of days." He explained that Osborne was just trying to get in touch with two people whom Mitchell named as references. Dr. Kallas recognized that "considerable time ha[d] passed" and thanked Mitchell for her patience.

The long delay was not cost-free for Mitchell. While she waited, her psychological health was deteriorating. In May 2012, she reported feeling unsafe with silverware. A clinician's notes from July reflect that she was "not doing well regarding gender identity disorder issues." Though she was receiving periodic counseling services, the notes from these sessions suggest that they focused on her other mental health conditions, such as her post-traumatic stress (the result of a violent hate crime committed against her when she was 18). To the extent Mitchell's gender dysphoria was discussed, the notes primarily refer to the harassment Mitchell experienced and her desire to know the status of her treatment request.

Osborne did not submit a draft of her report until November 15, 2012. Curiously, the report was dated September 27. Mitchell received a copy of the draft on November 28, and the report was finalized on December 2. Though Osborne's conclusions came a full year after Mitchell asked for hormone treatment, her recommendations strongly supported Mitchell's request. Osborne concluded that Mitchell "is an excellent candidate for hormone therapy" and predicted that this treatment would very likely improve Mitchell's "functional stability and sense of psychological well-being." Osborne expected that hormones would help not only with Mitchell's gender dysphoria, but also with her post-traumatic stress as well.

Based on Osborne's unequivocal recommendation, Mitchell resubmitted her request for hormone therapy the same day that she reviewed the draft report. Dr. Kallas turned her down on January 2, 2013. His letter explained that she was not eligible for treatment because she was scheduled to be released that month. As a "point of information," Dr. Kallas said, DOC starts inmates on hormone therapy only when they have at

least six months left on their sentences, in order to allow for the several-month process of getting the person stabilized on the medication. Dr. Kallas encouraged Mitchell to seek hormone treatment upon her release; he even offered a copy of Osborne's report and information about community providers.

But Mitchell was thwarted again after her release on January 8, 2013. When she tried to follow up on Dr. Kallas's suggestion, her parole officers flatly forbade her from seeking hormone therapy. Indeed, as a condition of her parole, she was required to dress and present as a man. Though Mitchell provided the agents with a copy of Osborne's report and recommendations, the officers did not relent.

On February 18, 2015, Mitchell filed a *pro se* complaint in federal court against Dr. Kallas, Dr. Laurent, and DOC parole officers Joseph Ruhnke, Brittany Wolfe, and Nicole Raisbeck. (Mitchell also initially sued two DOC Secretaries, but she has not appealed the dismissal of these defendants.) The district court understood the suit as one under 42 U.S.C. § 1983 alleging deliberate indifference to a serious medical need. As required by the Prison Litigation Reform Act (PLRA), the court began by screening Mitchell's complaint. 28 U.S.C. § 1915A(a). It concluded that Mitchell failed to state a claim against the parole officers under the Eighth Amendment (as applied to the states through the Fourteenth Amendment), and so it dismissed them without prejudice. Though the court allowed the claims against Drs. Kallas and Laurent to proceed, it later granted summary judgment for them. It determined that neither one was deliberately indifferent to Mitchell's gender dysphoria, and regardless, both were entitled to qualified immunity. Mitchell filed an earlier appeal in which

she challenged some aspects of her parole, but we dismissed on the ground that it was moot. *Mitchell v. Wall*, 808 F.3d 1174 (7th Cir. 2015). The merits are now before us, and as there is no mootness problem this time, we consider whether the district court properly dismissed Mitchell's claims.

## II

As we noted earlier, because a person is deprived of her liberty while incarcerated, she "must rely on prison authorities to treat [her] medical needs." *Gamble*, 429 U.S. at 103. Unable to call her own doctor or walk into a hospital, an inmate with medical problems will go without treatment unless the prison provides care. If prison medical staff exhibit deliberate indifference to an inmate's serious medical condition, they subject her to unnecessary and wanton pain and suffering and thereby run afoul of the Eighth Amendment. *Id.* at 104–05; *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (*en banc*).

The state defendants do not dispute that Mitchell's gender dysphoria is a serious medical condition or that she never received hormones while in DOC custody. They maintain, however, that no jury could find that they were deliberately indifferent to her condition. To establish deliberate indifference, a plaintiff must show that the defendant "*actually* knew of and disregarded a substantial risk of harm." *Petties*, 836 F.3d at 728. Failing to provide care for a non-medical reason, when that care was recommended by a medical specialist, can constitute deliberate indifference. *Perez v. Fenoglio*, 792 F.3d 768, 778 (7th Cir. 2015). So too can inexplicable delays in treatment where the delays serve no penological purpose. *Petties*, 836 F.3d at 730. The district court held that neither the 13-month delay in evaluating Mitchell's request nor its ultimate denial constituted deliberate indifference. Moreover, the

court determined, the defendants were entitled to qualified immunity because there was no clearly established right to hormone treatment when requested. We take a fresh look at the district court's conclusions, viewing the record in the light most favorable to Mitchell. See *Orlowski v. Milwaukee Cnty.*, 872 F.3d 417, 421 (7th Cir. 2017); *Zimmerman v. Doran*, 807 F.3d 178, 182 (7th Cir. 2015).

## A

We start with Dr. Laurent. For a defendant to be liable under section 1983, she must be personally responsible for the alleged deprivation of the plaintiff's constitutional rights. *Wilson v. Warren Cnty.*, 830 F.3d 464, 469 (7th Cir. 2016). The personal-involvement requirement is satisfied if the constitutional violation occurs at a defendant's direction or with her knowledge or consent. *Id.* Here, the alleged deprivation of adequate medical care occurred because of the time it took to resolve Mitchell's treatment request and the ultimate outcome—rejection. Dr. Laurent was not a member of the Gender Dysphoria Committee, nor did she take part in the decisions to get a consultation from Osborne or to deny Mitchell's request for hormones.

Nonetheless, Dr. Laurent may be liable under section 1983 if she acquiesced in the failure to provide necessary medical treatment. *Minix v. Canarecci*, 597 F.3d 824, 833–34 (7th Cir. 2010). Dr. Laurent was the psychological services supervisor at the prison where Mitchell was housed. In that role, she signed treatment notes from sessions where Mitchell complained about her distress and the harassment she experienced as a result of her gender dysphoria. Though Dr. Laurent was not Mitchell's assigned clinician, she did meet with Mitchell for one session. Additionally, in April 2012, Mitchell

directly asked Dr. Laurent for an update on when she would meet with Osborne.

Yet, even assuming that she knew about Mitchell's distress, there is no evidence that Dr. Laurent could have sped up Osborne's evaluation or the Committee's deliberations, or could have influenced the Committee's final decision. In fact, there is evidence that as a psychologist, Dr. Laurent had no authority to order hormone therapy. Because Dr. Laurent was not sufficiently involved in the failure to provide hormone therapy, the district court properly granted summary judgment in her favor.

B

Next we turn to Dr. Kallas. As DOC's Mental Health Director and a member of the Gender Dysphoria Committee, Dr. Kallas was directly involved in Mitchell's treatment. He contacted Osborne for a consultation and sat on the Committee that ultimately denied Mitchell's request.

We begin with the question whether Dr. Kallas is entitled to qualified immunity. A prison official is immune from suit if the constitutional right at issue was not clearly established at the time of the violation, and thus a reasonable officer would not have known that his conduct was unlawful. *Orlowski*, 872 F.3d at 421. In deciding whether a right was clearly established, it is essential to assess the case at the right level of specificity. *White v. Pauly*, 137 S. Ct. 548, 551–52 (2017). But this particularity requirement does not go so far as to mandate a mirror-image precedent from the Supreme Court or this court. *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866–67 (2017) (stating that the "very action in question" need not have been found to be unlawful (citation omitted)). As we put it recently, the

Eighth Amendment duty "need not be litigated and then established disease by disease or injury by injury." *Estate of Clark v. Walker*, 865 F.3d 544, 553 (7th Cir. 2017) (rejecting a highly specific framing of the right at stake); see also *Estate of Perry v. Wenzel*, 872 F.3d 439, 460 (7th Cir. 2017) (same).

Dr. Kallas urges that he is entitled to qualified immunity because no binding decision guarantees inmates the right to a speedier gender dysphoria evaluation or short-term hormone therapy prior to release. That formulation, however, frames the right too narrowly. Dr. Kallas has conceded (consistently with other cases) that Mitchell's gender dysphoria was a serious medical need. See *Fields v. Smith*, 653 F.3d 550, 556 (7th Cir. 2011); *Maggert v. Hanks*, 131 F.3d 670, 671 (7th Cir. 1997); *Meriwether v. Faulkner*, 821 F.2d 408, 413 (7th Cir. 1987). The first question is thus whether a prison doctor would have known that it was unconstitutional *never* to provide a person with the appropriate treatment for her particular case (and for many others)—hormone therapy. *Fields*, 653 F.3d at 556.

Prison officials have been on notice for years that leaving serious medical conditions, including gender dysphoria, untreated can amount to unconstitutional deliberate indifference. *E.g.*, *Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011) (refusing to provide a prescribed treatment or to follow a specialist's advice can violate the Eighth Amendment); *Fields*, 653 F.3d at 556 ("Refusing to provide effective treatment for a serious medical condition serves no valid penological purpose and amounts to torture."). An absence of treatment is equally actionable whether the inmate's suffering is physical or psychological. See *Meriwether*, 821 F.2d at 413. Because circuit precedent clearly established that a total absence of treat-

ment for the serious medical needs created by gender dyspho-
ria is unconstitutional, Dr. Kallas may not claim qualified im-
munity for the denial of Mitchell's request for care.

The question remains, however, whether on this record
such a total denial of care could be found by a jury. The facts
in this respect are disputed. On the one hand, Mitchell never
received the hormone therapy that Osborne, on DOC's behalf,
concluded that she needed. Instead, while Mitchell waited for
a response to her plea, she got nothing but occasional visits
with psychologists. Although Dr. Kallas argues that these vis-
its were themselves "treatment," the notes from those ses-
sions indicate that they were not focused on her gender dys-
phoria, but instead were primarily designed to deal with her
post-traumatic stress and the harassment she faced. And more
broadly, psychological visits are not automatically a substi-
tute for other medical treatments. See *De'lonta v. Johnson*, 708
F.3d 520, 525–26 (4th Cir. 2013) (providing "*some* treatment"
does not necessarily mean providing "*constitutionally adequate*
treatment"); *Fields*, 653 F.3d at 556. No one would say that a
psychologist could treat someone's epilepsy, nor would we
say that a counseling session is a substitute for high blood
pressure medication, even though stress can have an adverse
effect on blood pressure. In some cases, a psychological con-
dition, such as bipolar disorder, should not be treated by
counseling alone: medication can be essential. So it is with her
gender dysphoria, Mitchell says. And even if the therapy ses-
sions addressed Mitchell's gender dysphoria to a degree, she
may still recover if they did nothing actually to treat her con-
dition. See *Arnett*, 658 F.3d at 751; see also *Fields*, 653 F.3d at
556 ("Although DOC can provide psychotherapy as well as
antipsychotics and antidepressants, defendants failed to pre-
sent evidence rebutting the testimony that these treatments

do nothing to treat the underlying disorder [gender dysphoria].”). Given the opinions of the prison doctors and Osborne, Mitchell has presented enough evidence to move forward.

To the extent that Mitchell may be complaining about the length of time it took for the assessment to be completed, as opposed to the lack of treatment, our answer is different. It is true that delays in care for “non-life-threatening but painful conditions may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate’s pain.” *Arnett*, 658 F.3d at 753; see also *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010). Yet prisons have limited resources, and that fact makes some delay inevitable. *Petties*, 836 F.3d at 730. For a delay in treatment to qualify as deliberate indifference, we must weigh “the seriousness of the condition and the ease of providing treatment.” *Id.* As we have said, the serious nature of gender dysphoria is not disputed here. But the ease of evaluating the appropriateness of hormone therapy remains to be considered. There is little evidence about the typical length of these evaluations, either in prisons or in the community. The few courts that have considered this question (some after the events in question) have determined that even longer delays in evaluating an inmate’s candidacy for hormone treatment did not amount to deliberate indifference. See *Arnold v. Wilson*, No. 1:13cv900, 2014 WL 7345755, at *6 (E.D. Va. Dec. 23, 2014) (24-month delay in prescribing hormones); *Rowe v. Corr. Med. Servs., Inc.*, No. 1:08-cv-827, 2010 WL 3779561, at *6–7 (W.D. Mich. Aug. 18, 2010) (15-month delay). Because Dr. Kallas was not on notice that a 13-month evaluation would violate Mitchell’s Eighth Amendment right, he is entitled to qualified immunity on any possible claim of unreasonable delay.

That is not to say that this delay cannot be criticized. Far from it. The lack of any sense of urgency, or even of the need for prompt follow-through, is quite disturbing. But on these facts, no clearly established law would have signaled to Dr. Kallas that this delay amounted to deliberate indifference.

C

With respect to Dr. Kallas, that leaves the question whether he was deliberately indifferent in failing to treat Mitchell's condition during the entirety of her stay at DOC, even after Osborne recommended that Mitchell receive hormone therapy. Mitchell accuses Dr. Kallas of doing nothing while the evaluation process was ongoing, and then (through the Committee) denying her request because she was going to be released within a month. Dr. Kallas claimed that DOC had an unwritten rule that an inmate may start hormone therapy only if she has *six* months left on her sentence, and he denied her request on that basis. He later explained in an affidavit that this period was intended to allow time to figure out the proper hormone dosage while monitoring both physical and psychological side effects.

The first problem is that this requirement appears nowhere in DOC's written policy on gender dysphoria. This conspicuous absence from DOC's freshly-minted policy raises the factual question whether DOC actually had such a practice. Moreover, the question remains whether Dr. Kallas and the Committee exercised medical judgment in applying the policy to Mitchell's request. Neither professional disagreement nor medical malpractice constitutes deliberate indifference. *Cesal v. Moats*, 851 F.3d 714, 721, 724 (7th Cir. 2017). Thus, if the trier of fact finds that there was such a policy and

that Dr. Kallas and the Committee had a medical basis for de-
ciding not to start Mitchell's hormone treatments, then Dr.
Kallas will not be liable. If the factfinder alternatively con-
cludes that there was no such policy, or that Dr. Kallas failed
to assess whether application of the policy was appropriate in
Mitchell's case, then it would follow that he did not exercise
his medical judgment and was deliberately indifferent. "The
denial of hormone therapy based on a blanket rule, rather
than an individualized medical determination, constitutes de-
liberate indifference in violation of the Eighth Amendment."
*Hicklin v. Precynthe*, No. 4:16-cv-01357, 2018 WL 806764, at *11
(E.D. Mo. Feb. 9, 2018); accord *Kosilek v. Spencer*, 774 F.3d 63,
91 (1st Cir. 2014); *De'lonta v. Angelone*, 330 F.3d 630, 635
(4th Cir. 2003); *Allard v. Gomez*, 9 F. App'x 793, 794–95 (9th Cir.
2001).

We have no reason to doubt that hormone therapy poses a
health risk if not properly controlled. But the same could be
said about medications for countless other conditions. It
seems exceedingly unlikely that DOC would refuse to com-
mence a course of treatment for an inmate who was about to
leave, just because continuity of care protocols would require
a hand-off to a different provider. Would it really refuse to
address breathing problems, or cardiac problems, or even a
broken leg, just because one doctor begins the treatment and
another completes it? At this stage, the parties disagree about
the critical question whether DOC could have provided
Mitchell with something more than counseling services—per-
haps a limited prescription for hormones—to bridge the gap
between her release from custody and the time when she
found a new provider in the community.

In sum, there remain material disputes about whether Dr. Kallas and the Committee balanced the pros and cons of starting Mitchell on hormones, or if they just looked at the calendar and reflexively dismissed her request. The district court should not have granted summary judgment on Mitchell's claim for the refusal to provide care.

### III

Finally, we consider Mitchell's argument that the parole officers were improperly dismissed from this case. The district court concluded that Mitchell failed to allege sufficient facts to support a finding that the parole officers were personally involved in making decisions about her gender dysphoria treatment or that they were obligated to provide her such treatment.

Reading Mitchell's *pro se* complaint in the light most favorable to her, as we must, *Perez*, 792 F.3d at 776, we conclude that she did state a claim against the parole officers. Mitchell's complaint did not suggest that her parole officers had a legal duty to arrange hormone therapy for her. Rather, her argument was that the officers impermissibly *forbade* her from dressing as a woman and seeking hormone treatment on her own. She alleged that the agents had ample notice that a bar on taking hormones would harm her. They had a copy of her medical records and Osborne's report, which even mentioned that hormone treatment would help ward off recidivism.

We have not yet addressed whether parole officers can be liable for deliberate indifference to a parolee's serious medical need, though we have found that their actions implicate the Eighth Amendment in some situations. See *Hankins v. Lowe*, 786 F.3d 603, 606 (7th Cir. 2015) (holding that parolee stated

an Eighth Amendment claim that her parole officer subjected her to restrictive conditions past the expiration of her term of parole). One district court has contemplated that parole officers can be liable for deliberate indifference by placing conditions on a plaintiff that prevent her from taking the medically indicated course of care. *Stewart v. Raemisch*, No. 09-C-123, 2009 WL 3754173, at *3 (E.D. Wis. Nov. 4, 2009) (entertaining a suit against a parole agent where parolee was required to seek employment but could not for medical reasons). And we have held that custodial prison staff violate the Eighth Amendment by interfering with or preventing necessary medical care. *McDonald v. Hardy*, 821 F.3d 882, 888 (7th Cir. 2016); see also *Gamble*, 429 U.S. at 104–05. Though parole officers may have no duty under *Gamble* to provide a parolee with medical care or ensure that she receives it, they at least may be constitutionally obligated not to block a parolee who is trying to arrange such care for herself without any basis in the conditions of parole. See 429 U.S. at 105 (deliberate indifference to a serious medical issue "[r]egardless of how evidenced" states a cause of action under section 1983). From that perspective, Mitchell pleaded enough to proceed on the theory that the parole officers acted with deliberate indifference to her gender dysphoria by blocking her from getting care.

In its ruling on Mitchell's motion to reconsider, the district court offered an additional reason for dismissing the parole officers: it was concerned that the claims against the parole officers and those against the doctors were not sufficiently related to continue in the same lawsuit. When screening prisoners' complaints under the PLRA, courts can and should sever an action into separate lawsuits or dismiss defendants who are improperly joined under Federal Rule of Civil Procedure

20(a)(2). *Owens v. Hinsley*, 635 F.3d 950, 952 (7th Cir. 2011). A prisoner may join defendants in the same action only if the claims against each one "aris[e] out of the same transaction, occurrence, or series of transactions or occurrences … ." FED. R. CIV. P. 20(a)(2)(A); *George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007).

The question then is whether Mitchell's claim against the parole officers should have been brought in a separate law-suit. Out of concern about unwieldy litigation and attempts to circumvent the PLRA's fee requirements, we have urged district courts and defendants to beware of "scattershot" pleading strategies. *E.g.*, *Owens v. Evans*, 878 F.3d 559, 561 (7th Cir. 2017); *Owens v. Godinez*, 860 F.3d 434, 436 (7th Cir. 2017). We target for dismissal "omnibus" complaints—often brought by repeat players—that raise claims about unrelated conduct against unrelated defendants. *E.g.*, *Evans*, 878 F.3d at 561; *Hinsley*, 635 F.3d at 952.

Mitchell's complaint stands in stark contrast to these scattershot suits. Mitchell has focused on a series of events stemming from one issue: her inability to get hormone therapy while she remained in state custody. One of the defendants' arguments underscores that Mitchell's claims belong together. In an attempt to disclaim deliberate indifference, Dr. Kallas stresses that he gave Osborne's report to Mitchell, along with information about Wisconsin providers, so that she could seek hormone therapy in the community once she was released on parole. The parole officers, however, told her she was not allowed to follow through on Dr. Kallas's advice. She thus suffered an ongoing denial of treatment arising out of one fundamental occurrence, well within the bounds of Rule 20(a)(2). The fact that Mitchell has different theories of

liability against the different defendants does not diminish the fact that her claims are sufficiently related. "The two sets of claims are against different defendants, but they belong in the same suit because they arise out of the same set of connected transactions." *Terry v. Spencer*, 888 F.3d 890, 894 (7th Cir. 2018). Given Mitchell's allegations of a fairly continuous period in which two sets of defendants denied or interfered with her access to needed medical treatment, it is easy to imagine that if the claims were tried separately, each set of defendants could try to shift blame to the other. Handling the claims against both sets of defendants in one case minimizes the risk of unfairness from such inconsistent defenses succeeding in separate trials.

The fact that the district court dismissed Mitchell's claim against the parole agents without prejudice does not change our conclusion, nor does the fact that her claim probably would not be time-barred under Wisconsin's generous six-year statute of limitations. See *Kennedy v. Huibregtse*, 831 F.3d 441, 442 (7th Cir. 2016). Mitchell was entitled not to split her claims against these two sets of defendants. On remand, she will be entitled to proceed against both Dr. Kallas and the parole officers.

## IV

Punishment for Mitchell's crimes cannot extend to the deprivation of the medical treatment she requires for her serious gender dysphoria. The Wisconsin DOC staff must approach Mitchell's request for treating gender dysphoria with the same urgency and care as it would any other serious medical condition. We AFFIRM the judgment in favor of Dr. Laurent, but we REVERSE with respect to Dr. Kallas and Parole

Agents Ruhnke, Wolfe, and Raisbeck, and REMAND for proceedings consistent with this opinion.