# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-51148

United States Court of Appeals
Fifth Circuit

**FILED**
March 29, 2019

Lyle W. Cayce
Clerk

SCOTT LYNN GIBSON, also known as Vanessa Lynn,

Plaintiff - Appellant

v.

BRYAN COLLIER; DR. D. GREENE,

Defendants - Appellees

Appeal from the United States District Court
for the Western District of Texas

Before SMITH, BARKSDALE, and HO, Circuit Judges.

JAMES C. HO, Circuit Judge:

A state does not inflict cruel and unusual punishment by declining to provide sex reassignment surgery to a transgender inmate. The only federal court of appeals to decide such a claim to date has so held as an *en banc* court. *See Kosilek v. Spencer*, 774 F.3d 63, 76–78, 87–89, 96 (1st Cir. 2014) (en banc). The district court in this case so held. And we so hold today.

Under established precedent, it can be cruel and unusual punishment to deny essential medical care to an inmate. But that does not mean prisons must provide whatever care an inmate wants. Rather, the Eighth Amendment "proscribes only medical care so unconscionable as to fall below society's

minimum standards of decency." *Id.* at 96 (citing *Estelle v. Gamble*, 429 U.S. 97, 102–5 (1976)).

Accordingly, "mere disagreement with one's medical treatment is insufficient" to state a claim under the Eighth Amendment. *Delaughter v. Woodall*, 909 F.3d 130, 136 (5th Cir. 2018). This bedrock principle dooms this case. For it is indisputable that the necessity and efficacy of sex reassignment surgery is a matter of significant disagreement within the medical community. As the First Circuit has noted—and counsel here does not dispute—respected medical experts fiercely question whether sex reassignment surgery, rather than counseling and hormone therapy, is the best treatment for gender dysphoria. *See Kosilek*, 774 F.3d at 76–78, 87 (surveying conflicting testimony concerning medical efficacy and necessity of sex reassignment surgery).

What's more, not only do respected medical experts disagree with sex reassignment surgery—so do prisons across the country. That undisputed fact reveals yet another fatal defect in this case. For it cannot be cruel *and unusual* to deny treatment that no other prison has ever provided—to the contrary, it would only be unusual if a prison decided *not* to deny such treatment.

The dissent correctly observes that no evaluation for sex reassignment surgery was ever provided in this case, because Texas prison policy does not authorize such treatment in the first place. The dissent suggests that a blanket ban is unconstitutional—and that an individualized assessment is required. But that defies common sense. To use an analogy: If the FDA prohibits a particular drug, surely the Eighth Amendment does not require an individualized assessment for any inmate who requests that drug. The dissent's view also conflicts with *Kosilek*—as both the dissent in *Kosilek* and counsel here acknowledge, the majority in *Kosilek* effectively allowed a blanket ban on sex reassignment surgery.

No. 16-51148

In addition, the dissent would remand to correct certain alleged procedural errors made by the district court. But counsel has asked us to reach the merits, forfeiting any procedural objections that could have been brought. And the dissent's remaining procedural concerns are redundant of the substantive debate over the proper interpretation of the Eighth Amendment. We affirm.[1]

I.

Scott Lynn Gibson is a transgender Texas prison inmate in the custody of the Texas Department of Criminal Justice (TDCJ) in Gatesville. He was originally convicted and sent to prison on two counts of aggravated robbery. In prison, he committed the additional crimes of aggravated assault, possession of a deadly weapon, and murder. He was convicted of those subsequent offenses, and is now sentenced to serve through May 2031, and eligible for parole in April 2021.

Gibson was born male. But as his brief explains, he has been diagnosed as having a medical condition known today as "gender dysphoria" or "Gender Identity Disorder" (GID). He has lived as a female since the age of 15 and calls himself Vanessa Lynn Gibson.[2]

---

[1] In reaching this judgment, we express no opinion on the ongoing debate over the medical necessity or efficacy of sex reassignment surgery, other than to acknowledge the existence and vigor of that debate. Nor do we express any opinion as to what alternative medical treatments, if any, Texas prison officials might voluntarily offer to Gibson, as a matter of policy or compassion. We conclude only that the Constitution affords us no authority, as a court of law, to make such decisions on behalf of Texas.

[2] We use male pronouns, consistent with TDCJ policy—which Gibson does not appear to challenge. Tex. Dep't of Criminal Justice, OFFENDER INFORMATION DETAILS: SCOTT LYNN GIBSON, https://offender.tdcj.texas.gov/OffenderSearch/offenderDetail.action?sid=05374437 (last visited Mar. 29, 2019) (listing Gibson as male and assigning him to male-only prison facility). *See also Farmer v. Brennan*, 511 U.S. 825, 829, 832, 851 (1994) (using male pronouns for transgender prisoner born male); *id.* at 852–54 (Blackmun, J., concurring) (same); *Praylor v. Texas Dep't of Criminal Justice*, 430 F.3d 1208, 1208–9 (5th Cir. 2005) (per curiam) (same); *cf. Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (Brennan, J.) (plurality op.) ("[S]ex . . . is an immutable characteristic determined solely by . . . birth.").

No. 16-51148

The American Psychiatric Association defines "gender dysphoria" in its most recent *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) as a "marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months duration, as manifested by" at least two of six factors, namely:

> 1. A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics. . . . 2. A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender. . . . 3. A strong desire for the primary and/or secondary sex characteristics of the other gender. 4. A strong desire to be of the other gender (or some alternative gender different from one's assigned gender). 5. A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender). 6. A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender).

As the Manual further notes, "[t]he condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning."

Gibson has averred acute distress. He is depressed, has attempted to castrate or otherwise harm himself, and has attempted suicide three times (though he says that gender dysphoria was not the sole cause of his suicide attempts). His prison medical records reflect that he has consistently denied any suicidal urges. But in this litigation, Gibson has averred that, if he does not receive sex reassignment surgery, he will castrate himself or commit suicide.

After he threatened to castrate himself, Gibson was formally diagnosed with gender dysphoria and started mental health counseling and hormone therapy. Since his formal diagnosis, Gibson has repeatedly requested sex reassignment surgery, explaining that his current treatment regimen of

No. 16-51148

counseling and hormone therapy helps, but does not fully ameliorate, his dysphoria.

TDCJ Policy G-51.11 provides that transgender inmates must be "evaluated by appropriate medical and mental health professionals and [have their] treatment determined on a case by case basis," reflecting the "[c]urrent, accepted standards of care." Although there is some dispute whether the Policy forbids sex reassignment surgery or is merely silent about it, doctors have denied Gibson's requests because the Policy does not "designate [sex reassignment surgery] . . . as part of the treatment protocol for Gender Identity Disorder."[3]

## II.

This appeal comes to us with an unusual procedural history. Proceeding *pro se*, Gibson sued, *inter alia*, the Director of the TDCJ (now, Bryan Collier), challenging TDCJ Policy G-51.11 as unconstitutional under the Eighth Amendment, both facially and as applied. He argued that Policy G-51.11 amounts to systematic deliberate indifference to his medical needs, because it prevents TDCJ from even considering whether sex reassignment surgery is medically necessary for him. He demanded injunctive relief requiring TDCJ to evaluate him for sex reassignment surgery.[4]

The Director moved for summary judgment on two grounds: qualified immunity and sovereign immunity. Notably, the Director did not move for summary judgment on the merits of Gibson's Eighth Amendment claim.

---

[3] The dissent refers to a "clinic note" seeking to schedule Gibson for an individualized assessment for sex reassignment surgery, but acknowledges that Gibson's counsel does not argue that the clinic note is relevant to this appeal. Diss. Op. at 17–18.

[4] Gibson also sued "Dr. D. Greene" at the prison hospital, along with the Municipality of Gatesville. The district court dismissed both of those defendants, and those claims are not at issue in this appeal.

No. 16-51148

Gibson nevertheless responded to the motion for summary judgment on the merits. He argued that the Policy prohibits potentially necessary medical care. To support his claim of medical necessity, he attached the Standards of Care issued by the World Professional Association for Transgender Health (WPATH). Those standards provide that, "for many [transgender people,] [sex reassignment] surgery is essential and medically necessary to alleviate their gender dysphoria." WPATH, STANDARDS OF CARE FOR THE HEALTH OF TRANSSEXUAL, TRANSGENDER, AND GENDER-NONCONFORMING PEOPLE 54 (7th ed., 2011) (STANDARDS OF CARE).

The district court rejected the Director's two immunity defenses— denying qualified immunity because this is a suit for injunctive relief, not damages, and denying sovereign immunity under *Ex parte Young*. But the district court granted summary judgment for the Director on the merits of Gibson's Eighth Amendment claim.

Gibson appealed *pro se*. This court appointed experienced counsel to advocate on Gibson's behalf. With the assistance of able counsel, Gibson declined to protest any procedural defect in these proceedings. Instead, Gibson asks us to reverse solely on the basis of the merits of his Eighth Amendment claim, and to remand for further proceedings accordingly.

We accept Gibson's invitation to reach his deliberate indifference claim on the merits, rather than reverse based on any procedural defects in the district court proceedings. In doing so, we note that, had Gibson presented any such procedural concerns, we might very well have remanded this case for further proceedings. But he did not do so—as the dissent admits. *See* Diss. Op. at 4 (admitting that "Gibson did not assert not being able to present essential facts"); *id.* at 6 (admitting that "Gibson on appeal does not contest the violation of this Rule"). And we presume he had good reason not to do so.

6

No. 16-51148

Reasonable counsel might conclude that it would be a waste of time and resources for everyone involved (and give false hope to Gibson) to remand for procedural reasons. After all, Gibson is destined to lose on remand if he is unable to identify any genuine dispute of material fact. That is the case here, as we shall demonstrate.

## III.

We review grants of summary judgment *de novo*, and ask whether "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "'[T]he substantive law will identify which facts are material.' This means '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 378 (5th Cir. 2019) (second alteration in original) (citation omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).[5]

The Eighth Amendment forbids cruel and unusual punishments. The Supreme Court has construed this prohibition to include "deliberate indifference to serious medical needs of prisoners." *Gamble*, 429 U.S. at 104.

---

[5] The dissent contends that we have somehow misapplied the standards governing summary judgment. The contention is meritless. We all agree that summary judgment is proper where there is no genuine dispute as to any material fact—and that the underlying substantive law (here, the Eighth Amendment) dictates which facts are material. As we explain below, Eighth Amendment precedent establishes that medical disagreement is not actionable. Given the demonstrable medical disagreement over sex reassignment surgery, we conclude—consistent with established precedent—that there are no material facts in dispute here. In sum, the dissent's disagreement concerns substantive Eighth Amendment law, not the standards that govern summary judgment.

The dissent's related complaint—that we have somehow misplaced the burden of production on Gibson, rather than on TDCJ where it belongs—fails for similar reasons. To recognize the futility of Gibson's claim does not place the burden of production on him. It simply follows from the established rule that summary judgment is proper in the absence of a dispute over facts that might affect the outcome of the suit under the governing law.

No. 16-51148

To establish deliberate indifference, Gibson must first demonstrate a serious medical need. *Gobert v. Caldwell*, 463 F.3d 339, 345 n.12 (5th Cir. 2006) (citing *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994)). Second, he must show that the Department acted with deliberate indifference to that medical need. *Herman v. Holiday*, 238 F.3d 660, 664 (5th Cir. 2001) (citing *Palmer v. Johnson*, 193 F.3d 346, 352 (5th Cir. 1999)).

Here, the State of Texas does not appear to contest that Gibson has a serious medical need, in light of his record of psychological distress, suicidal ideation, and threats of self-harm. Instead, the State disputes that it acted with deliberate indifference to his medical needs.

"[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Gamble*, 429 U.S. at 104 (citation omitted) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976) (plurality op.)). This is a demanding standard.

Negligence or inadvertence is not enough. "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Id.* at 106. "[A]n inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.'" *Id.* at 105–6.

Rather, the inmate must show that officials acted with malicious intent—that is, with knowledge that they were withholding medically necessary care. The plaintiff must show that officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in

8

any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985).

There is no intentional or wanton deprivation of care if a genuine debate exists within the medical community about the necessity or efficacy of that care. "Disagreement with medical treatment does not state a claim for Eighth Amendment indifference to medical needs." *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997) (collecting cases). There is no Eighth Amendment claim just because an inmate believes that "medical personnel should have attempted different diagnostic measures or alternative methods of treatment." *Id. See also Mayweather v. Foti*, 958 F.2d 91, 91 (5th Cir. 1992) (prisoners are not entitled to "the best [treatment] that money c[an] buy").

Gibson seems to accept this standard. As his brief notes, to state an Eighth Amendment claim, he must demonstrate "universal acceptance by the medical community" that sex reassignment surgery treats gender dysphoria.

This is not to say, of course, that a single dissenting expert automatically defeats medical consensus about whether a particular treatment is necessary in the abstract. "Universal acceptance" does not necessarily require unanimity. But where, as here, there is robust and substantial good faith disagreement dividing respected members of the expert medical community, there can be no claim under the Eighth Amendment. *See, e.g., Kosilek*, 774 F.3d at 96 ("Nothing in the Constitution mechanically gives controlling weight to one set of professional judgments.") (quoting *Cameron v. Tomes*, 990 F.2d 14, 20 (1st Cir. 1993)).

Accordingly, there is no genuine dispute of material fact as to deliberate indifference under the Eighth Amendment where—as here—the claim concerns treatment over which there exists on-going controversy within the medical community. Indeed, Gibson himself admits as much.

No. 16-51148

IV.

The district court concluded that Gibson failed to present a genuine dispute of material fact concerning deliberate indifference. To quote: "Plaintiff would prefer a policy that provides [sex reassignment surgery]. However, a Plaintiff's disagreement with the diagnostic decisions of medical professionals does not provide the basis for a civil rights lawsuit." Op. at 20. "Plaintiff provides . . . no witness testimony or evidence from professionals in the field demonstrating that the WPATH-suggested treatment option of [sex reassignment surgery] is so universally accepted, that to provide some but not all of the WPATH-recommended treatment amounts to deliberate indifference." *Id.* at 19. "Accordingly, Plaintiff fails to establish there is a genuine issue of material fact as to whether the policy is unconstitutional on its face or as applied to Plaintiff." *Id.* at 20.

We agree. What's more, the conclusion of the district court is further bolstered by a recent ruling by one of our sister circuits. As the First Circuit concluded in *Kosilek*, there is no consensus in the medical community about the necessity and efficacy of sex reassignment surgery as a treatment for gender dysphoria. At oral argument, Gibson's counsel did not dispute that the medical controversy identified in *Kosilek* continues to this day. This on-going medical debate dooms Gibson's claim.

A.

The sparse record before us includes only the WPATH Standards of Care, which declares sex reassignment surgery both effective and necessary to treat some cases of gender dysphoria. As the First Circuit has concluded, however, the WPATH Standards of Care reflect not consensus, but merely one side in a sharply contested medical debate over sex reassignment surgery.

No. 16-51148

The *en banc* First Circuit considered whether a prison acted with deliberate indifference when it failed to offer sex reassignment surgery to a Massachusetts inmate. *Kosilek*, 774 F.3d at 68–96. Although the prison denied the surgery, it offered "hormones, electrolysis, feminine clothing and accessories, and mental health services." *Id.* at 89.

As part of its deliberate-indifference analysis, the First Circuit considered whether WPATH and its proponents reflect medical consensus. It concluded that, notwithstanding WPATH, sex reassignment surgery is medically controversial. Accordingly, Massachusetts prison officials were not deliberately indifferent when they "chose[] one of two alternatives—both of which are reasonably commensurate with the medical standards of prudent professionals, and both of which provide [the plaintiff] with a significant measure of relief." *Id.* at 90. The court held that this choice between treatments "is a decision that does not violate the Eighth Amendment." *Id.*

To support its decision, the First Circuit exhaustively detailed the underlying expert testimony in the case. That testimony is crucial because it provides objective evidence that the medical community is deeply divided about the necessity and efficacy of sex reassignment surgery. As the First Circuit explained, respected doctors profoundly disagree about whether sex reassignment surgery is medically necessary to treat gender dysphoria.

To begin with, *Kosilek* recounted the testimony of Dr. Chester Schmidt, "a licensed psychiatrist and Associate Director of the Johns Hopkins School of Medicine." *Id.* at 76. He testified that "'[t]here are many people in the country who disagree with [WPATH] standards who are involved in the [gender dysphoria] field.'" *Id.* (first alteration in original). As a result, "Dr. Schmidt expressed hesitation to refer to the [WPATH] Standards of Care, or the recommendation for [sex reassignment surgery], as medically necessary. He

11

emphasized the existence of alternative methods and treatment plans accepted within the medical community." *Id.* at 76–77.

Next, the court summarized Cynthia Osborne's testimony. *Id.* at 77. She is "a gender identity specialist employed at the Johns Hopkins School of Medicine who had experience working with other departments of correction regarding [gender dysphoria] treatment." *Id.* at 70. She testified that "she did not view [sex reassignment surgery] as medically necessary in light of 'the whole continuum from noninvasive to invasive' treatment options available to individuals with [gender dysphoria]." *Id.* at 77.[6]

Third, the First Circuit considered the opinions of an expert appointed by the district court, "Dr. Stephen Levine, a practitioner at the Center for Marital and Sexual Health in Ohio and a clinical professor of psychiatry at Case Western Reserve University School of Medicine." *Id.*

As the First Circuit pointed out, "Dr. Levine had helped to author the fifth version of the [WPATH] Standards of Care." *Id.* So it was notable that Dr. Levine expressed concerns that later versions of WPATH were driven by political considerations rather than medical judgment. His written report "explain[ed] the dual roles that WPATH . . . plays in its provision of care to individuals with GID." *Id.* As the report stated:

> WPATH is supportive to those who want sex reassignment surgery
> (SRS). . . . Skepticism and strong alternate views are not well
> tolerated. . . . The [Standards of Care are] the product of an

---

[6] Schmidt and Osborne are not the only experts at the Johns Hopkins School of Medicine who question the necessity and effectiveness of sex reassignment surgery. *See*, *e.g.*, Paul McHugh, *Transgender Surgery Isn't the Solution*, WALL ST. J. (May 13, 2016), https://www.wsj.com/articles/paul-mchugh-transgender-surgery-isnt-the-solution-1402615120; *see also* Amy Ellis Nutt, *Long Shadow Cast by Psychiatrist on Transgender Issues Finally Recedes at Johns Hopkins*, WASH. POST (Apr. 5, 2017), https://www.washingtonpost.com/national/health-science/long-shadow-cast-by-psychiatrist-on-transgender-issues-finally-recedes-at-johns-hopkins/2017/04/05/e851e56e-0d85-11e7-ab07-07d9f521f6b5_story.html?noredirect=on&utm_term=.062c67bae5fe.

enormous effort to be balanced, but *it is not a politically neutral document.* WPATH aspires to be both a scientific organization and an advocacy group for the transgendered. These aspirations sometimes conflict.

*Id.* at 78 (first alteration in original) (emphasis added).

Dr. Levine also expressed concerns that the support for sex reassignment surgery expressed in the Standards of Care lacked medical support. "The limitations of the [Standards of Care], however, are not primarily political. They are caused by the lack of rigorous research in the field." *Id.* "Dr. Levine further emphasized that 'large gaps' exist in the medical community's knowledge regarding the long-term effects of [sex reassignment surgery] and other [gender dysphoria] treatments in relation to its positive or negative correlation to suicidal ideation." *Id.* Dr. Levine ultimately agreed with Dr. Schmidt's testimony:

> Dr. Schmidt's view, however unpopular and uncompassionate in the eyes of some experts in [gender dysphoria], is within prudent professional community standards. Treatment stopping short of [sex reassignment surgery] would be considered adequate by many psychiatrists.

*Id.* And when asked to confirm if "prudent professionals can reasonably differ as to what is at least minimally adequate treatment" for gender dysphoria, Dr. Levine agreed: "Yes, and do." *Id.* at 87.

Finally, the court noted that "Dr. Marshall Forstein, Associate Professor of Psychiatry at Harvard Medical School . . . issued a written report, in which he noted that 'the question of the most prudent form of treatment is complicated by the diagnosis of [gender dysphoria] being on the margins of typical medical practice.'" *Id.* at 79.

To be sure, not all of the testimony was negative toward sex reassignment surgery. *See id.* at 74–76, 77, 79. And not all of it was about sex

reassignment surgery generally, as distinguished from the plaintiff's individual need for such surgery. But the unmistakable conclusion that emerges from the testimony is this: There is no medical consensus that sex reassignment surgery is a necessary or even effective treatment for gender dysphoria.[7]

We see no reason to depart from the First Circuit. To the contrary, we agree with the First Circuit that the WPATH Standards of Care do not reflect medical consensus, and that in fact there is no medical consensus at this time. WPATH itself acknowledges that "this field of medicine is evolving." STANDARDS OF CARE 41. The record in *Kosilek* documents more than enough dissension within the medical community to conclude that it is not deliberately indifferent for Texas prison officials to decline to authorize sex reassignment surgery.

Indeed, even one of the dissenters in *Kosilek* felt compelled to acknowledge the "carefully nuanced and persuasive testimony that medical science has not reached a wide, scientifically driven consensus mandating [sex reassignment surgery] as the only acceptable treatment for an incarcerated individual with gender dysphoria." 774 F.3d at 114 (Kayatta, J., dissenting). That admission is fatal to this case as well.[8]

---

[7] Nor is the *Kosilek* testimony alone in questioning the efficacy of sex reassignment surgery. In August 2016, for example, the Center for Medicare & Medicaid Services at the U.S. Department of Health and Human Services issued a "Decision Memo for Gender Dysphoria and Gender Reassignment Surgery." The memo surveyed the available medical literature and found that there was insufficient expert medical evidence to support sex reassignment surgery with respect to Medicare and Medicaid patients. *See generally* CMS, *Decision Memo for Gender Dysphoria and Gender Reassignment Surgery* (Aug. 30, 2016), https://www.cms.gov/medicare-coverage-database/details/nca-decision-memo.aspx?NCAId=282.

[8] We are not aware of any circuit that has disagreed with *Kosilek*. The Fourth and Ninth Circuits allowed Eighth Amendment claims for sex reassignment surgery to survive motions to dismiss, without addressing the merits. *See Rosati v. Igbinoso*, 791 F.3d 1037, 1040 (9th Cir. 2015) (per curiam); *De'lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013).

No. 16-51148

B.

Gibson relies exclusively on the WPATH Standards of Care to support his claim that failure to evaluate for sex reassignment surgery constitutes deliberate indifference to his serious medical needs. Yet he too acknowledges that WPATH's conclusions are hotly contested.

When asked about *Kosilek* at oral argument, Gibson's counsel did not dispute that the Standards of Care are a matter of contention within the medical community. In fact, counsel conceded as much, acknowledging that the First Circuit in *Kosilek* "criticizes" WPATH and "doesn't recognize [WPATH] as having universal consensus." Oral Arg. 10:50–11:33.

Gibson nevertheless asks this court to remand so that he can present evidence of his individual need for sex reassignment surgery. Oral Arg. 11:35–12:10; 13:27–16:22. We do not see how evidence of individual need would change the result in this case, however. Any evidence of Gibson's personal medical need would not alter the fact that sex reassignment surgery is fiercely debated within the medical community. Because Gibson does not dispute the expert testimony assembled by the First Circuit concerning the medical debate surrounding sex reassignment surgery, he cannot establish on remand that such surgery is universally accepted as an effective or necessary treatment for gender dysphoria. Nor can he contend that TDCJ has been deliberately

---

Moreover, various circuits, including our own, have rejected Eighth Amendment claims for *hormone therapy*—never mind sex reassignment surgery—to treat gender dysphoria, at least in individual cases. *See Praylor*, 430 F.3d at 1209 ("[W]e hold that, on this record, the refusal to provide hormone therapy did not constitute the requisite deliberate indifference."); *Meriwether v. Faulkner*, 821 F.2d 408, 413 (7th Cir. 1987) ("[Prisoners do] not have a right to any particular type of treatment, such as estrogen therapy."); *Supre v. Ricketts*, 792 F.2d 958, 963 (10th Cir. 1986) ("It was never established, however, that failing to treat plaintiff with estrogen would constitute deliberate indifference to a serious medical need. While the medical community may disagree among themselves as to the best form of treatment for plaintiff's condition, the [prison] made an informed judgment as to the appropriate form of treatment and did not deliberately ignore plaintiff's medical needs.").

indifferent to his serious medical needs—particularly where TDCJ continues to treat his gender dysphoria through other means. *See Brauner v. Coody*, 793 F.3d 493, 500 (5th Cir. 2015) ("Deliberate indifference is not established when 'medical records indicate that [the plaintiff] was afforded extensive medical care by prison officials.'") (alteration in original) (quoting *Norton*, 122 F.3d at 292).

In sum, Gibson has failed to present a genuine dispute of material fact. There is no material fact dispute as to whether TDCJ was deliberately indifferent to his medical needs. It is undisputed that TDCJ has provided him with counseling and hormone therapy. And he acknowledges the on-going good faith medical debate over the necessity and efficacy of sex reassignment surgery.

## C.

The dissent contends that we are not permitted to look at the record in *Kosilek*. Although it might have been better practice for TDCJ to present its own evidence, rather than borrow from *Kosilek*, we disagree that this warrants reversal.

No legal authority compels the state, every time a prison inmate demands sex reassignment surgery, to undertake the time and expense of assembling a record of medical experts, pointing out what we already know—that sex reassignment surgery remains one of the most hotly debated topics within the medical community today. There is no reason why—as a matter of either common sense or constitutional law—one state cannot rely on the universally shared experiences and policy determinations of other states.[9]

---

[9] *Cf. City of Erie v. Pap's A.M.*, 529 U.S. 277, 297 (2000) (plurality op.) ("Erie could reasonably rely on the evidentiary foundation set forth in [*City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986)] and [*Young v. American Mini Theatres, Inc.*, 427 U.S. 50 (1976)] to the effect that secondary effects are caused by the presence of even one adult

No. 16-51148

D.

The dissent also suggests that *Kosilek* allows a prison to deny sex reassignment surgery only if the prison first makes an individualized assessment of the inmate's particular medical needs. Under this view, it would be unconstitutional for a prison system to make a categorical policy judgment not to wade into the controversial world of sex reassignment surgery—as TDCJ did here.

There are a number of problems with this theory. To begin with, Gibson's own brief acknowledges that, if the logic of *Kosilek* is correct, it would allow a "blanket refusal to provide SRS." Counsel made the same acknowledgment during oral argument. The court stated: "But your brief acknowledges that the reasoning of the First Circuit is essentially allowing a blanket ban." Counsel responded: "And in fact, we do that by adopting the dissent—you're correct, your Honor—by adopting the dissent's position," referring to the dissent in *Kosilek*. Oral Arg. 10:02–10:20.

Our dissenting colleague suggests that counsel subsequently retracted this admission. But counsel's original admission—made first in writing, and then again at the podium—is consistent with the dissent in *Kosilek*, which likewise construed the logic of the *en banc* majority to permit a blanket ban. To quote the dissent: "[T]he majority in essence creates a de facto ban on sex reassignment surgery for inmates in this circuit. . . . [T]he precedent set by this court today will preclude inmates from ever being able to mount a

entertainment establishment in a given neighborhood."); *Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377, 393 n.6 (2000) ("'The First Amendment does not require a city, before enacting . . . an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses.'") (alteration in original) (quoting *Playtime Theatres*, 475 U.S. at 51–52).

17

successful Eighth Amendment claim for sex reassignment surgery in the courts." *Kosilek*, 774 F.3d at 106–7 (Thompson, J., dissenting).

Moreover, putting *Kosilek* to one side, there is a more fundamental problem with the dissent's contention that the Eighth Amendment requires individualized assessments, and thus forbids categorical judgments about the necessity and efficacy of certain medical treatments. To illustrate: An entire agency of the federal government—the Food and Drug Administration—is devoted to making categorical judgments about what medical treatments may and may not be made available to the American people. So imagine an inmate seeks a form of medical treatment that happens to be favored by some doctors, but has not (at least not yet) been approved by the FDA. Could the inmate challenge this deprivation on the ground that it is a categorical prohibition on medical treatment, rather than an individualized assessment? Surely not. There is no basis in the text or original understanding of the Constitution— nor in Supreme Court or Fifth Circuit precedent—to conclude that a medical treatment may be categorically prohibited by the FDA, yet require individualized assessment under the Eighth Amendment. The dissent seems to acknowledge this, stating only that "*[o]ther circuits* have time and again held that . . . a blanket policy . . . *could* constitute deliberate indifference." Diss. Op. at 20–21 (emphases added) (discussing examples from Fourth and Ninth Circuits).

### E.

Finally, the dissent does not dispute that no circuit has disagreed with *Kosilek*. So the dissent relies primarily on a recent ruling by a federal district court ordering the state of Idaho to provide sex reassignment surgery to an inmate. *See Edmo v. Idaho Dep't of Corr.*, 2018 WL 6571203, *19 (D. Idaho Dec. 13, 2018) (appeal pending).

No. 16-51148

But *Edmo* did not even mention *Kosilek*. To the contrary, it held that the Eighth Amendment requires "even controversial" procedures. *Id.* at *1. Our circuit precedent, by contrast, rejects Eighth Amendment claims in cases involving medical disagreement. *See, e.g., Norton*, 122 F.3d at 292. Yet that is precisely what the district court in *Edmo* did. It took sides in an on-going medical debate—much like the district court did in *Kosilek*. And just as the district court in *Kosilek* was subsequently reversed by the First Circuit *en banc*, so too the judgment of the district court in *Edmo* should not survive appeal.

After all, *Edmo* rejected the views of multiple medical experts who disputed the efficacy of sex reassignment surgery for inmates—including Dr. Campbell, the Idaho Department of Correction's chief psychologist (and a WPATH member). 2018 WL 6571203, at *6–7. The dissent points out that the record in *Edmo* includes expert medical testimony disagreeing with two of the doctors that the First Circuit credited in *Kosilek*. But that is not news—*Kosilek* itself included the testimony of other medical experts—some who agreed, and some who disagreed, with those doctors.

At bottom, our disagreement with the dissent concerns not the record evidence in *Kosilek* or *Edmo* or any other case, but the governing constitutional standard. We can all agree that sex reassignment surgery remains an issue of deep division among medical experts. Indeed, that is precisely our point. We see no basis in Eighth Amendment precedent—and certainly none in the text or original understanding of the Constitution—that would allow us to hold a state official deliberately (and unconstitutionally) indifferent, for doing nothing more than refusing to provide medical treatment whose necessity and efficacy is hotly disputed within the medical community.

19

No. 16-51148

V.

As a matter of established precedent, Gibson's claim plainly fails, due to the undisputed medical controversy over sex reassignment surgery. But there is an even more fundamental flaw with his claim, as a matter of constitutional text and original understanding.

Lest we lose the forest for the trees, a prison violates the Eighth Amendment only if it inflicts punishment that is *both* "cruel *and unusual*." U.S. CONST. amend. VIII (emphasis added). As the text makes clear, these are separate elements. *See, e.g.*, ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 116 (2012) ("[I]n the well-known constitutional phrase *cruel and unusual punishments*, the *and* signals that cruelty or unusualness alone does not run afoul of the clause: The punishment must meet both standards to fall within the constitutional prohibition."); Akhil Reed Amar, *America's Lived Constitution*, 120 YALE L.J. 1734, 1778 (2011) ("[W]hether hypothetical punishment X is 'cruel' as well as unusual is of course a separate question.").

Under the plain meaning of the term, a prison policy cannot be "unusual" if it is widely practiced in prisons across the country. One of the nation's leading originalist scholars put the point simply: "'[U]nusual' should mean what it says. . . . [S]o long as Congress routinely authorized a particular punishment, it would be hard to say that the punishment, even if concededly cruel, was 'cruel *and unusual*.'" Amar, 120 YALE L.J. at 1778–79.[10]

---

[10] *See also* John F. Stinneford, *The Original Meaning of "Unusual": The Eighth Amendment as a Bar to Cruel Innovation*, 102 NW. U. L. REV. 1739, 1745 (2008) ("As used in the Eighth Amendment, the word 'unusual' was a term of art that referred to government practices that are contrary to 'long usage' or 'immemorial usage.' Under the common law ideology that came to the founding generation through Coke, Blackstone, and various others, the best way to discern whether a government practice comported with principles of justice was to determine whether it was continuously employed throughout the jurisdiction for a

This understanding of the term "unusual"—that widely accepted practices, such as the denial of sex reassignment surgery, do not violate the Eighth Amendment—is not just commanded by constitutional text. It is also consistent with opinions issued by various members of the Supreme Court. This is particularly notable considering that few constitutional provisions have divided members of the Court more vigorously than the Eighth Amendment.

In *Harmelin v. Michigan*, 501 U.S. 957 (1991), for example, Justice Scalia wrote that, "by forbidding 'cruel *and unusual* punishments,' the Clause disables the Legislature from authorizing . . . cruel methods of punishment that are *not regularly or customarily employed*." *Id.* at 976 (op. of Scalia, J.) (second emphasis added) (citations omitted). "[T]he word 'unusual'" means "'such as [does not] occu[r] in ordinary practice,' '[s]uch as is [not] in common use.'" *Id.* (alterations in original) (quoting WEBSTER'S AMERICAN DICTIONARY (1828); WEBSTER'S SECOND INTERNATIONAL DICTIONARY 2807 (1954)).

Similarly, in *Stanford v. Kentucky*, 492 U.S. 361 (1989), Justice Scalia explained that "[t]he punishment is either 'cruel *and* unusual' (*i. e.*, society has set its face against it) or it is not. The audience for these arguments, in other words, is not this Court but the citizenry of the United States. It is they, not we, who must be persuaded. For as we stated earlier, our job is to *identify* the 'evolving standards of decency'; to determine, not what they *should* be, but what they *are*." *Id.* at 378 (op. of Scalia, J.).

The specific holding of *Stanford*—that it is not cruel and unusual punishment to impose capital punishment on 16 and 17-year-olds—was later abrogated by *Roper v. Simmons*, 543 U.S. 551 (2005). But *Simmons* did not abrogate Justice Scalia's interpretation of "unusual." To the contrary, the

very long time, and thus enjoyed 'long usage.' The opposite of a practice that enjoyed 'long usage' was an 'unusual' practice, or in other words, an innovation.") (footnotes omitted).

majority in *Simmons* relied heavily on "[t]he evidence of national consensus against the death penalty for juveniles" to support its holding. *Id.* at 564. "30 States prohibit the juvenile death penalty." *Id.* And "even in the 20 States without a formal prohibition on executing juveniles, the practice is infrequent. Since *Stanford*, six States have executed prisoners for crimes committed as juveniles. In the past 10 years, only three have done so: Oklahoma, Texas, and Virginia." *Id.* at 564–65. *See also id.* at 565 ("In December 2003 the Governor of Kentucky decided to spare the life of Kevin Stanford, and commuted his sentence to one of life imprisonment without parole, with the declaration that '[w]e ought not be executing people who, legally, were children.' By this act the Governor ensured Kentucky would not add itself to the list of States that have executed juveniles within the last 10 years even by the execution of the very defendant whose death sentence the Court had upheld in *Stanford v. Kentucky*.") (alteration in original) (citation omitted).

Similarly, Justice Breyer has observed that "[t]he Eighth Amendment forbids punishments that are cruel and *unusual*. Last year, in 2014, only seven States carried out an execution. Perhaps more importantly, in the last two decades, the imposition and implementation of the death penalty have increasingly become unusual." *Glossip v. Gross*, 135 S. Ct. 2726, 2772 (2015) (Breyer, J., dissenting).

Gibson's claim fails this fundamental principle. As his counsel has acknowledged, only one state to date, California, has ever provided sex reassignment surgery to a prison inmate. Oral Arg. 28:20–53. It did so in January 2017, pursuant to the settlement of a federal lawsuit. Before that

No. 16-51148

litigation, no prison in the United States had ever provided sex reassignment surgery to an inmate.[11]

Accordingly, Gibson cannot state a claim for cruel *and unusual* punishment under the plain text and original meaning of the Eighth Amendment, regardless of any facts he might have presented in the event of remand.

* * *

Gibson acknowledges that sex reassignment surgery for prison inmates was unheard of when proceedings in this case began—and that it was only done for the first time, anywhere, a year later in California, in response to litigation. Gibson nevertheless contends that what was unprecedented until just recently—and done only once in our nation's history—suddenly rises to a constitutional mandate today. That is not what the Constitution requires. It cannot be deliberately indifferent to deny in Texas what is controversial in every other state. The judgment is affirmed.

---

[11] *See, e.g., Quine v. Beard*, 2017 WL 1540758, *1 (N.D. Cal. Apr. 28, 2017) ("Under the Agreement, [the California Department of Corrections and Rehabilitation] agreed to provide sex reassignment surgery to Plaintiff."); Kristine Phillips, *A Convicted Killer Became the First U.S. Inmate to get State-Funded Gender-Reassignment Surgery*, WASH. POST (Jan. 10, 2017), https://www.washingtonpost.com/news/post-nation/wp/2017/01/10/a-transgender-inmate-became-first-to-get-state-funded-surgery-advocates-say-fight-is-far-from-over/?utm_term=.e236ac6bbd90 ("After a lengthy legal battle, a California transgender woman became the first inmate in the United States to receive a government-funded gender-reassignment surgery."); *see also Rosati*, 791 F.3d at 1040 ("[T]he state acknowledged at oral argument that no California prisoner has ever received SRS.").

No. 16-51148

RHESA HAWKINS BARKSDALE, Circuit Judge, dissenting:

The Director of the Texas Department of Criminal Justice (TDCJ) was awarded summary judgment on a basis not urged by him; and, to make matters far worse, in awarding judgment on the merits *sua sponte*, the district court did not provide Gibson the required notice that it would consider such a basis and allow Gibson to respond.    Accordingly, as the majority notes correctly, this appeal springs from this very unusual and improper procedure and resulting sparse summary-judgment record, which is insufficient for summary-judgment purposes.    Therefore, this case should be remanded for further proceedings.    Accordingly, I must respectfully dissent from the majority's reaching the merits of this action, which concerns the Eighth Amendment's well-established requirements for medical treatment to be provided prisoners.

I.

Gibson's *pro se* complaint claimed: sex-reassignment surgery (SRS) is a medically-necessary treatment for gender dysphoria; and the Director, in violation of the Eighth Amendment, was deliberately indifferent to Gibson's serious medical need (gender dysphoria) by refusing to allow Gibson to even be evaluated for SRS, due to a blanket ban on SRS instituted by TDCJ Policy No. G-51.11.    The Director moved for summary judgment on the basis of qualified and Eleventh Amendment immunity.    The district court denied immunity, but then, *sua sponte*, improperly granted summary judgment on the merits, without providing notice to Gibson—as required by Federal Rule of Civil Procedure 56(f)—that it was considering a basis for granting summary judgment not advanced by the Director in his motion and, concomitantly, giving Gibson the opportunity to respond.

24

II.

Procedurally, summary judgment was improperly granted for several reasons, in violation of bedrock bases for ensuring fundamental due process to the nonmovant in a summary-judgment proceeding. Substantively, numerous reasons compel summary judgment's not being granted, most especially the requested medical relief's not being considered based on Gibson's individual needs.

A.

Gibson proceeded *pro se* in district court. The procedure employed by the district court in granting summary judgment against Gibson flies in the face of fundamental fairness, which Rule 56 (summary judgment), and caselaw concerning it, seek to ensure. Regrettably, the majority compounds the error.

1.

The Director moved for summary judgment based only on immunity: qualified and Eleventh Amendment. When relief is sought against an official in his individual capacity, in our considering entitlement *vel non* to qualified immunity, the well-known, two-prong analysis is employed: first, "whether the facts alleged, taken in the light most favorable to the party asserting the injury, show that the [official's] conduct violated a constitutional right", *Price v. Roark*, 256 F.3d 364, 369 (5th Cir. 2001) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Glenn v. City of Tyler*, 242 F.3d 307, 312 (5th Cir. 2001)); and, second, if the allegations show a constitutional violation, "whether the right was clearly established—that is whether 'it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted'", *id.* (quoting *Saucier*, 533 U.S. at 202). The district court did not address these two prongs, instead denying qualified immunity because Gibson was only seeking injunctive relief against the Director in his official capacity.

But, in urging qualified immunity, the Director's brief—which was incorporated in his summary-judgment motion—addressed, *inter alia*, the Eighth Amendment claim by discussing the first prong of the qualified-immunity analysis. The Director asserted Gibson "failed to state an actionable claim for medical deliberate indifference". In support of this contention, the Director claimed, *inter alia*, "[Gibson's] disagreement with the course of treatment pursued by prison medical staff does not constitute a viable claim for deliberate indifference to serious medical needs under the Eight[h] Amendment".

Proceeding *pro se*, Gibson's response to the Director's immunity claims, *inter alia*, necessarily addressed Gibson's Eighth Amendment deliberate-indifference claim in the context of the first prong of the qualified immunity urged by the Director. Gibson contended SRS is not demanded, or even requested; rather, Gibson requested an evaluation by a gender-dysphoria specialist so that Gibson's condition could be fully assessed, and a determination made by a medical professional, based on Gibson's individualized needs, whether SRS would adequately treat Gibson's gender dysphoria. Gibson averred there was a genuine dispute of material fact as to: whether Gibson had a serious medical condition; whether Gibson was entitled to medical care that meets prudent professional standards, as opposed to being denied medical care based on a blanket policy; and whether the Director was deliberately indifferent to Gibson's serious medical need.

The discussion for qualified-immunity purposes in the summary-judgment motion and Gibson's *pro se* response may be why the district court improperly went beyond the summary-judgment motion, based only on immunity, and addressed the merits of the Eighth Amendment claim. But, at this very early stage of the proceeding, no discovery had been taken, and

material facts were unavailable to Gibson.  Gibson's affidavit in opposition to summary judgment stated TDCJ was enforcing a blanket ban and refusing to allow doctors to fully evaluate medical needs.  As a result, Gibson was unable to prove SRS is medically necessary in this case, because TDCJ prevented Gibson from even being evaluated for SRS.

Along that line, Rule 56(d) provides:  "If a nonmovant [for a summary-judgment motion] shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition [to summary judgment], the court may:  (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order".  Fed. R. Civ. P. 56(d).  While Gibson did not assert not being able to present essential facts, including because of not being aware the court was considering a basis for judgment not advanced by the Director, this Rule reflects the necessity of allowing a party opposing summary judgment to garner such facts.

In addition, in *Celotex Corp. v. Catrett*, the Supreme Court explained that summary judgment can be entered against a party which fails to show it will be able to prove an essential element of its case "after adequate time for discovery".  477 U.S. 317, 322 (1986).  Gibson was not allowed discovery. Gibson filed requests for admissions, which the Director never answered, instead filing a motion for a protective order based on his qualified-immunity defense.

The court never ruled on the Director's protective order, but ruled, in granting summary judgment, that, although the Director did not have immunity, Gibson had not shown a genuine dispute of material fact.  For instance, the court found, *inter alia,* "the record contain[ed] no evidence addressing the security issues associated with adopting in full the WPATH

standards in an institutional setting". *Gibson v. Livingston*, No. 6:15-cv-190, at 19 (W.D. Tex. 31 Aug. 2016).  Notwithstanding the fact that the court improperly placed the burden of showing security concerns on Gibson, the record contained no evidence of security concerns because there had been no discovery.  Ruling on the merits without compelling the Director to respond to Gibson's discovery requests, after denying the Director's qualified-immunity defense, flies in the face of clear Supreme Court precedent.

More to the point concerning the district court's addressing the merits *sua sponte*, Rule 56(f) provides, *inter alia*: "*After giving notice and a reasonable time to respond*, the court may . . . grant the [summary-judgment] motion on *grounds not raised by a party . . . .*"  Fed. R. Civ. P. 56(f)(2) (emphasis added).  Contrary to this Rule, the district court ruled on the merits without giving Gibson any notice or opportunity to respond.

Regarding *sua sponte* grants of summary judgment, "we have vacated summary judgments and remanded for further proceedings where the district court provided no notice prior to granting summary judgment *sua sponte, even where 'summary judgment may have been appropriate on the merits'*". *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 28 F.3d 1388, 1398 (5th Cir. 1994) (emphasis added) (affirming district court's *sua sponte* grant of summary judgment because plaintiffs could not identify how discovery would yield a genuine dispute of material fact) (citing *Judwin Properties, Inc. v. U.S. Fire Ins.*, 973 F.2d 432, 437 (5th Cir. 1992)).  "Since a summary judgment forecloses any future litigation of a case the district court must give proper notice to [e]nsure that the nonmoving party had the opportunity to make every possible factual and legal argument." *Id.* (quoting *Powell v. United States*, 849 F.2d 1576, 1579 (5th Cir. 1988)).  "When there is no notice to the nonmovant, summary judgment will be considered harmless *if*

*the nonmovant has no additional evidence* or if all the nonmovant's additional evidence is reviewed by the appellate court and none of the evidence presents a genuine [dispute] of material fact."   *Id.* (emphasis in original) (quoting *Resolution Trust Corp. v. Sharif-Munir-Davidson Dev. Corp.*, 992 F.2d 1398, 1403 n.7 (5th Cir. 1993)).

Gibson was not given every opportunity to present evidence and contentions in opposing summary judgment on the basis for which it was granted.  Gibson, as an inmate, must rely on TDCJ or the court to allow an evaluation to determine if SRS is necessary for Gibson.  Accordingly, we have not been able to evaluate all the evidence to determine if there are no genuine disputes of material fact, as that evaluation has not been allowed.  Although Gibson on appeal does not contest the violation of this Rule, which exists to ensure fundamental due process, it is one factor that should be considered in evaluating this insufficient record.

The majority at 3 states Gibson has "forfeit[ed]" any procedural objections because Gibson has now asked for a ruling on the merits.  (In that regard, the majority is inconsistent:  it notes that Gibson has asked our court to rule on the merits, but also states at 15 that Gibson has asked our court to remand, so that evidence of Gibson's individual need for SRS can be presented.)  But, just as a party cannot decide our standard of review, a party also cannot decide an insufficient record is sufficient.

2.

The majority, as did the district court, consistently places the burden of production on Gibson.  But, at hand is a summary judgment.  It may be granted only when there is no genuine dispute of material fact and movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Because the Director, not Gibson, moved for summary judgment, it was the Director's burden to

"demonstrate the absence of a genuine [dispute] of material fact". *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (citing *Celotex*, 477 U.S. at 323; *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 885–86 (1990)). "If the [movant] fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." *Id.* Only if the Director met his burden would the burden shift to Gibson to "go beyond the pleadings and designate specific facts showing that there is a genuine [dispute] for trial". *Id.* (citing *Celotex*, 477 U.S. at 325).

Again, if a genuine dispute of material fact exists, we cannot hold movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); s*ee Johnson v. Treen*, 759 F.2d 1236, 1237 (5th Cir. 1985) ("Accordingly, on appeal we view all materials in the light most favorable to [nonmovant] . . . to determine if there is any [dispute] of material fact. *If no such [dispute] exists*, we must *then* determine if [movant is] entitled to judgment as a matter of law." (emphasis added) (citation omitted)).

In moving for summary judgment only on the basis of immunity, the Director provided the following evidence in support: Gibson's grievance records; Gibson's medical records from January 2014-August 7, 2015; and TDCJ Policy No. G-51.11. The Director submitted no evidence regarding the medical necessity *vel non* of SRS in treating gender dysphoria.

In response, Gibson offered as evidence: Gibson's affidavit, grievance records, and psychiatric records from a psychiatric facility; literature on health care and transgender individuals, including excerpts from a report detailing the WPATH Standard of Care, which state "for many . . . surgery is essential and medically necessary to alleviate their gender dysphoria"; a copy of TDCJ's policy on surgical castration for sex offenders; and copies of correspondence to Gibson from TDCJ Correctional Managed Health Care.

Therefore, because the Director did not provide evidence showing an absence of a dispute as to the medical necessity of SRS in treating gender dysphoria, he did not meet his burden; summary judgment was improper.

The majority does not address the Director's failure to show an absence of a dispute for a material fact, which was the Director's burden, as movant, under Rule 56(a).  Instead, the majority, throughout its opinion, claims *Kosilek v. Spencer*, 774 F.3d 63 (1st Cir. 2014) (en banc), shows there is no genuine dispute of material fact in regard to the medical controversy surrounding SRS; but, in district court, the Director did not even cite *Kosilek*, much less contend the evidence presented in *Kosilek* was dispositive.  Again, the majority can only state that Gibson "has failed to present a genuine dispute of material fact", *Maj. Opn.* at 16, without citation to *any* facts presented to the district court by the Director, without any citation for why it was Gibson's burden at this stage, and without citation for whether there is any proof regarding whether this medical controversy—which it submits at 2 "dooms" Gibson's claim—still exists, over four years after *Kosilek* was decided.  Nevertheless, the majority at 7 note 5 states there is no merit to my contention that it is misplacing the burden of production on Gibson.

Again, though, the majority is improperly taking evidence from another case (*Kosilek*, decided by the first circuit over four years ago, and tried well before then)—facts not presented in this case to the district court—and is refusing to evaluate those facts in the requisite light most favorable to Gibson, the nonmovant.  *See Johnson*, 759 F.2d at 1237 ("The burden is on the moving party to establish that there is no genuine issue of fact and the party opposing the motion should be given the benefit of every reasonable inference in his favor." (citation omitted)).

Instead, the majority contends at 7 note 5 that it is "recogniz[ing] the futility of Gibson's claim"; however, a review of relevant caselaw yielded no precedent providing for the denial of remand based on futility when there is a genuine dispute of material fact at the summary-judgment stage. The majority is, in essence, skipping straight to the "judgment as a matter of law" prong for summary judgment. That is improper, because, as noted *supra*, this court must first determine *there is no genuine dispute of material fact*. Obviously, as explained more fully *infra*, under the Eighth Amendment deliberate-indifference standard, individualized medical assessment is required in each case to determine the necessity of a particular treatment for a prisoner. Because Gibson has not received the requested and physician-ordered evaluation for SRS, there is a genuine dispute of material fact—whether SRS is medically necessary *in Gibson's case*.

The majority instead, in essence, is treating this Rule 56 summary-judgment motion as a motion to dismiss for failure to state a claim, pursuant to Rule 12(b)(6). *See Maj. Opn.* at 2, 8, 9, & 23 ("Accordingly, Gibson *cannot state a claim* for cruel *and unusual* punishment under the plain text and original meaning of the Eighth Amendment, regardless of any facts he might have presented in the event of remand." (first emphasis added)). Here, we are not determining whether Gibson failed to state a claim (Gibson did state a claim for deliberate indifference), but are instead determining whether, *inter alia*, there are genuine disputes of material fact. Again, I emphasize, the only facts presented to the district court regarding the medical necessity of SRS were the WPATH Standards of Care. As much as it claims not to have, in its zeal to interpret the original text of the Eighth Amendment (which, as explained *infra* has already been done by the Supreme Court in *Estelle v. Gamble*, 429 U.S. 97 (1976)), the majority has "missed the trees for the forest"

by disregarding what stage of the proceeding we are evaluating and the concomitant standards for it.

B.

The procedural errors that compel vacating the summary judgment almost pale in comparison to the majority's going far outside the totally lacking summary-judgment record at hand in holding judgment was properly granted. This is reflected in the majority's refusing to consider Gibson's individual medical needs, which are in large part unknown because Gibson has never received the requested evaluation for SRS, despite the evaluation's being ordered by a TDCJ doctor.

1.

Instead of looking to the summary-judgment record for evidence of the claimed uncertainty in the medical community, the majority at 10–14 attempts to create its own record, as noted, from the opinion in *Kosilek* (en banc) (which, again, was not cited by the Director in the brief incorporated in his summary-judgment motion), and from other outside sources, *Maj. Opn.* at 12 & 14 nn.6–7. While we can, of course, look to other cases for legal analysis, we cannot reconstruct the summary-judgment record in this case from the record in another.

Moreover, this case is a far cry from *Kosilek*, which spanned over 20 years, had a very "expansive" record, and was not decided by summary judgment. *Kosilek*, 774 F.3d at 68. Throughout Kosilek's *trial*, testimony was provided by numerous medical professionals—including gender-dysphoria specialists who had evaluated Kosilek—regarding the medical necessity of SRS *in that case*, and from multiple prison officials regarding safety concerns if Kosilek were allowed SRS, neither of which is in issue for the summary judgment at hand.

No. 16-51148

Additionally, *Kosilek*, as noted, was decided more than four years ago, which is not as "recent" as the majority claims at 10. In the last four years, have there been any developments in the medical community regarding treating gender dysphoria and determining the necessity for SRS? We do not know because, in the instant summary-judgment record, we have no expert testimony or any evidence as to the medical necessity outside of the WPATH Standards of Care. (Somewhat along the line of relevant medical-community developments, the majority at 3 note 2, in discussing why it uses male pronouns for Gibson, cites *Frontiero v. Richardson* for the proposition that "sex . . . is an immutable characteristic determined solely by . . . birth". 411 U.S. 677, 686 (1973) (Brennan, J.) (plurality opinion). *Frontiero*, an equal-protection challenge, confronted the disparate treatment of women; its being cited by the majority is puzzling, to say the least. In any event, 46 years have passed since 1973, when *Frontiero* was decided.)

A recent example of the disagreement over the requirement under the Eighth Amendment to provide SRS in certain instances is the 13 December 2018 opinion in *Edmo v. Idaho Department of Corrections*. No. 1:17-cv-00151-BLW, 2018 WL 6571203 (D. Idaho 13 Dec. 2018), concerning the court's granting Edmo's motion for preliminary injunction and ordering the Idaho Department of Corrections (IDOC) to provide Edmo with SRS. There, the district court held Edmo had "satisfie[d] both elements of the deliberate-indifference" standard: Edmo proved there was a serious medical need; and IDOC and its medical provider, with full awareness of Edmo's circumstances, had refused to provide Edmo with SRS. *Id.* at *2. The district court went on to state: "In refusing to provide that surgery, IDOC and [its medical provider] have ignored generally accepted medical standards for the treatment of gender dysphoria". *Id.* The court also noted, as did the court in *Kosilek*, that its

34

opinion was based on "the unique facts and circumstances" of Edmo's case, and "is not intended, and should not be construed, as a general finding that all inmates suffering from gender dysphoria are entitled to" SRS. *Id.*

In so holding, the court found the "WPATH Standards of Care are the accepted standards of care for treatment of transgender patients", and "have been endorsed by the [National Commission on Correctional Health Care (NCCHC)] as applying to incarcerated persons". *Id.* at *15. The court found credible Edmo's two experts, doctors "who have extensive personal experience treating individuals with gender dysphoria both before and after receiving [SRS]". *Id.* at *15. One doctor testified "that [SRS] is the cure for gender dysphoria" and would "eliminate" Edmo's gender dysphoria, *id.* at *12; the other, that "it is highly unlikely that [Edmo's] severe gender dysphoria will improve without" SRS, *id.*

The court also gave "virtually no weight" to IDOC's experts, who had no "experience with patients receiving [SRS] or assessing patients for the medical necessity of [SRS]". *Id.* at *15. IDOC and its medical provider were trained by a doctor, *id.*, whose testimony in *Kosilek* is relied on heavily by the majority at 12–13. The court found that doctor and another, who also testified in *Kosilek* and is quoted by the majority at 12, were "outliers in the field of gender dysphoria treatment"; "do not ascribe to the WPATH Standards of Care"; and impose additional requirements on incarcerated individuals to receive SRS that have no scientific support, have not been endorsed by any professional organizations, and have not been adopted by the NCCHC. *Id.* at *16; *see also Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1188 (N.D. Cal. 2015) (finding the above-referenced doctor who trained IDOC and its medical provider was not credible because he testified as to "illogical inferences", misrepresented the WPATH Standards of Care, "overwhelmingly relie[d] on generalizations about

gender dysphoric prisoners, rather than an individualized assessment", and "admittedly include[d] references to a fabricated anecdote").

The record in *Edmo* contains more than, as the majority suggests at 19, a disagreement with the doctors in *Kosilek*. The courts in *Edmo* and *Norsworthy* found those doctors not credible in the light of their misrepresentations and refusal to subscribe to the medically-accepted standards of care—WPATH. *See, e.g., Edmo,* 2018 WL 6571203, at *16; *Norsworthy*, 87 F. Supp. 3d at 1188.

2.

The majority at 9 and 15 also errs in stating Gibson's "concessions". Gibson's statement that *the first circuit* (which decided *Kosilek en banc*) "doesn't recognize [WPATH] as having universal consensus" is not equivalent to a concession that WPATH is not universally accepted. And, contrary to the majority's statement at 15, Gibson *does* contest the expert testimony in *Kosilek* refuting such "universal acceptance". Although Gibson acknowledges that, while proceeding *pro se* in district court, Gibson did not present evidence of WPATH's universal acceptance, Gibson asserts such acceptance could be inferred as "[i]t is undisputed . . . that all reputable U.S. medical organizations have recognized WPATH as the proper standard of care".

In that regard, the majority rests on lack of "universal acceptance" of the medical necessity of SRS, stating that, to constitute deliberate indifference, the medical procedure must be "universally accepted". *E.g., Maj. Opn.* at 9, 10, & 15. Tellingly, the majority provides no citation to *any* caselaw regarding this universal-acceptance standard. In fact, the only citation for this point is to

No. 16-51148

Gibson's brief. *Maj. Opn.* at 9. Gibson's brief seemingly quoted the following statement from the district court's order:

> However, plaintiff provides as summary judgment evidence only portions of the WPATH report, and no witness testimony or evidence from professionals in the field demonstrating that the WPATH-suggested treatment option of SRS is so *universally accepted*, that to provide some but not all of the WPATH-recommended treatment amounts to deliberate indifference.

*Gibson*, No. 6:15-cv-190, at 19 (emphasis added). But, the district court did not cite any caselaw for this universal-acceptance standard either. And, a review of relevant caselaw yields no precedent for this standard. It is, therefore, improper to add this unfounded qualification to the well-known deliberate-indifference standard.

In any event, again, it was not Gibson's burden to show universal acceptance, because the Director failed to present *any* evidence demonstrating WPATH is *not* universally accepted. (The *Kosilek* court quoted *Cameron v. Tomes*, 990 F.2d 14, 20 (1st Cir. 1993), for the proposition that security concerns, as identified by prison administrators in *Kosilek*, are entitled to great deference—not, as the majority states at 9, as support for the controversial nature of SRS and the requirement of "universal consensus". *Kosilek*, 774 F.3d at 96.)

3.

The majority, at 12 and 14 notes 6–7, also cites three outside sources for evidence of the claimed controversy surrounding SRS. In note 6, the majority cites two news articles showing two doctors "are not the only experts at the Johns Hopkins School of Medicine who question the necessity and effectiveness

of [SRS]".  Johns Hopkins, however, has opened a transgender health service and resumed providing SRS to transgender individuals, a program cancelled by a former chief of psychiatry who felt SRS was not a viable treatment.  Amy Ellis Nutt, *Long Shadow Cast by Psychiatrist on Transgender Issues Finally Recedes at Johns Hopkins*, Wash. Post (5 Apr. 2017), https://www.washingtonpost.com/national/health-science/long-shadow-cast-by-psychiatrist-on-transgender-issues-finally-recedes-at-johns-hopkins/2017/04/05/e851e56e-0d85-11e7-ab07-07d9f521f6b5_story.html?noredirect=on&utm_term=.062c67bae5fe.

The Decision Memo by the Centers for Medicare & Medicaid Services (CMS), cited by the majority at 14 note 7, is also unpersuasive, and, in fact, if anything, supports Gibson's claim. The memo notes that CMS is not issuing a national coverage determination (NCD) for SRS "for Medicare beneficiaries with gender dysphoria because the clinical evidence is inconclusive *for the Medicare population*", but coverage determinations for SRS continue to be made locally "*on a case-by-case basis*".  CMS, *Decision Memo for Gender Dysphoria and Gender Reassignment Surgery*, at 2 (30 Aug. 2016), https://www.cms.gov/medicare-coverage-database/details/nca-decision-memo.aspx?NCAId=282 (emphasis added).

The memo goes on to acknowledge that, while SRS "may be a reasonable and necessary service for certain beneficiaries with gender dysphoria", "[t]he current scientific information is not complete for CMS to make a NCD that identifies the precise patient population for whom the service would be reasonable and necessary", and "[p]hysician recommendation is one of many potential factors that the local [Medicare Administrative Contractors] may consider when determining whether the documentation is sufficient to pay a claim".  *Id.* at 40–41.  A determination made on a case-by-case basis and

supported by physician recommendation is precisely what Gibson has been denied.

4.

It must also be noted that the *Kosilek* opinion is not nearly as determinative on the issue of the necessity *vel non* for SRS as the majority suggests. The majority in *Kosilek* stated: based on the *evaluation* of Kosilek by numerous medical professionals, the court was convinced that both the Massachusetts Department of Correction's (DOC) course of treatment and SRS could alleviate Kosilek's symptoms. *Kosilek*, 774 F.3d at 90.

But, it was "not the place of [the] court to 'second guess medical judgments' or to require that the DOC adopt the more compassionate of two adequate options". *Id.* (citations omitted). The first circuit warned that the opinion was not meant to "create a de facto ban against SRS as a medical treatment for any incarcerated individual", as any such "blanket policy regarding SRS" "would conflict with the requirement that medical care be *individualized* based on a particular prisoner's serious medical needs". *Id.* at 90–91 (emphasis added) (citing *Roe v. Elyea*, 631 F.3d 843, 862–63 (7th Cir. 2011) (holding failure to conduct individualized assessment of prisoner's needs may violate Eighth Amendment)).

I agree the evidence in *Kosilek* encompassed both Kosilek's individual medical needs and the broader dispute about the efficacy of SRS; however, the *holding* in *Kosilek* is based on Kosilek's specific circumstances. *Id.* at 89–92.

Addressing the subjective prong of deliberate indifference, the *Kosilek* court noted, "it is not the district court's own belief about medical necessity that controls, but what was known and understood by prison officials in crafting their policy". *Id.* at 91 (citation omitted). The court went on to acknowledge that the DOC had "solicited the opinion of multiple medical

professionals and was ultimately presented with two alternative treatment plans, *which were each developed by different medical experts to mitigate the severity of Kosilek's mental distress*". *Id.* (emphasis added). Inherent in that analysis is the fact that Kosilek was evaluated by medical professionals, and the DOC chose a course of treatment for Kosilek recommended by them.

And, contrary to the majority's assertion at 17–18, the dissent in *Kosilek* does not suggest anything else. The dissent does state: "the majority in essence creates a de facto ban on sex reassignment surgery for inmates in [the first] circuit". *Kosilek*, 774 F.3d at 106–07 (Thompson, J. dissenting). This was due, however, to the majority's crediting "the divergence of opinion *as to Kosilek's need for surgery*", which "only resulted from the DOC disregarding the advice of Kosilek's treating doctors and bringing in a predictable opponent to [SRS]". *Id.* at 107 (emphasis added). The dissent concluded: "So the question remains, if Kosilek—who was time and again diagnosed as suffering from severe gender identity disorder, and who was uniformly thought by qualified medical professionals to require surgery—is not an appropriate candidate for surgery, what inmate is"? *Id.*

The majority at 17 notes Gibson's brief "acknowledges that, if the logic of *Kosilek* is correct, it would allow a 'blanket refusal to provide SRS'". Gibson stated at oral argument, however: to the extent the brief acknowledged the blanket refusal, it was error; and Gibson does not take that position. Oral Argument 09:54–10:47 ("When you read *Kosilek*, that is not what it says."). Gibson further stated "the Eighth Amendment claim, as this court's precedents say repeatedly, turns on . . . individualized medical assessments". Oral Argument 11:40–12:11.

In that regard, unlike Gibson, Kosilek was evaluated for SRS and denied it based on security concerns, uncertainty in the medical community, and

conflicting medical opinions regarding Kosilek's individual needs. Gibson has not even received a requested evaluation, even though the summary-judgment record contains a "clinic note", electronically signed by Dr. Greene, stating: "Please schedule [Gibson] with unit MD *for evaluation for referral for sex change operation* and evaluation for medical pass for gender identity disorder." (Emphasis added.) Moreover, the district court referenced this ordered referral for SRS evaluation in its summary of the relevant summary-judgment evidence. (At oral argument, neither party was aware of this evidence.)

Again, the evaluation ordered by Dr. Greene has never occurred. As noted by the majority at 5, according to TDCJ, Gibson's requests for evaluation have been denied "because [TDCJ] Policy [No. G-51.11] does not 'designate [SRS] . . . as part of the treatment protocol for Gender Identity Disorder'". Gibson does not contend that TDCJ has refused a doctor's orders based on the ban *per se*, but Gibson does contend that requests for evaluations are denied based on the ban, and not on medical advice or valid penological interests. In any event, as our review is *de novo*, we are allowed to consider the entire record, which shows that a doctor ordered an evaluation, which has not occurred solely due to the ban. (The majority at 5 note 3 states: "Gibson's counsel does not argue that the clinic note is relevant to this appeal". But, as noted above, at oral argument neither party was aware it existed. Obviously, Gibson can urge, and has urged, the requirement for an individualized medical assessment of Gibson's medical needs—as required by the Eighth Amendment—without pointing out this clinic note. As also noted above, the district court referenced the clinic note in its order.)

Gibson also moved in district court to add to the summary-judgment record a news article in which the spokesman for TDCJ stated "it should be noted that offenders cannot have gender reassignment surgery which would be

considered elective and is not covered under the TDCJ offender health care plan", as further proof that TDCJ's denial of SRS is based on a policy and not on Gibson's medical need.  Gibson's motion was denied summarily in the order granting summary judgment.

In Gibson's case, a TDCJ medical professional ordered evaluation for SRS; but TDCJ, not due to a conflicting medical opinion, but instead based on a blanket policy, refused to have Gibson evaluated.  This is contrary to the Eighth Amendment's requirement that any denial of treatment be based on medical judgment in the specific-fact scenario.  *See Delaughter v. Woodall*, 909 F.3d 130, 138–39 & n.7 (5th Cir. 2018) ("We have previously suggested that a non-medical reason for delay in treatment constitutes deliberate indifference." (citing *Thibodeaux v. Thomas*, 548 F. App'x 174, 175 (5th Cir. 2013))); *Smith v. Carpenter*, 316 F.3d 178, 187 (2d Cir. 2003) ("[G]iven the fact-specific nature of Eighth Amendment denial of medical care claims, it is difficult to formulate a precise standard of 'seriousness' . . . ". (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1372 (7th Cir. 1997))); *Id.* ("Just as the relevant 'medical need' can only be identified in relation to the specific factual context of each case, the severity of the alleged denial of medical care should be analyzed with regard to all relevant facts and circumstances." (citation omitted)).

A second dissent in *Kosilek* disagreed with the standard of review the majority applied to what the dissent deemed were pure questions of fact.  *Id.* at 113–15 (Kayatta, J., dissenting).  The dissenting judge stated that even though he disagreed with the trial judge's findings on the medical necessity of SRS in Kosilek's case, the judge did not clearly err in finding the medical professionals who concluded SRS was necessary in Kosilek's case were more credible.  *Id.*  In stating why he would have found SRS was not medically necessary, the judge noted he believed one expert "provided carefully nuanced

and persuasive testimony that medical science has not reached a wide, scientifically driven consensus mandating SRS as the only acceptable treatment for an incarcerated individual with gender dysphoria". *Id.* at 114. The majority at 14 concludes that this "admission is fatal to this case". That the majority believes a statement by a dissenting judge as to how he personally would have weighed the testimony in another case could somehow doom Gibson's case is wide of the mark. The majority apparently believes Gibson was never entitled to due process for this claim because *Kosilek*, an out-of-circuit opinion, has foreclosed any advancement in the law and medical research in this area.

In addition, the majority's analogies to drugs banned by the FDA at 2 and 18 are inapposite. First, SRS is not subject to FDA approval. CMS, *Decision Memo for Gender Dysphoria and Gender Reassignment Surgery*, at 5–6 (30 Aug. 2016), https://www.cms.gov/medicare-coverage-database/details/nca-decision-memo.aspx?NCAId=282. Second, our focus in deliberate-indifference cases is on the actions of prison officials in response to treatment prescribed by medical professionals for serious medical needs of prisoners.

5.

This blanket ban on even an evaluation for SRS is clearly contrary to *Kosilek*'s holding. It even goes against TDCJ's G-51.11 policy, which provides that inmates with gender dysphoria are "evaluated by appropriate medical and mental health professionals and treatment determined on a case by case basis as clinically indicated", according to the "[c]urrent, accepted standards of care". TDCJ has denied Gibson evaluation for SRS and having treatment determined based on individualized needs, which is mandated under the "current, accepted standards of care"—WPATH—relied on by TDCJ in crafting its policy. Other

circuits have time and again held that refusal to treat, or evaluate for treatment, based on a blanket policy and not medical judgment, could constitute deliberate indifference. *See, e.g.*, *Rosati v. Igbinoso*, 791 F.3d 1037 (9th Cir. 2015) (per curiam); *Colwell v. Bannister*, 763 F.3d 1060 (9th Cir. 2014); *Fields v. Smith*, 653 F.3d 550 (7th Cir. 2011).

More importantly, our precedent suggests a refusal to evaluate Gibson for SRS or a decision to deny SRS not based on medical judgment could constitute deliberate indifference. *See, e.g.*, *Delaughter*, 909 F.3d at 138–39 & n.7 ("We have previously suggested that a non-medical reason for delay in treatment constitutes deliberate indifference." (collecting cases)); *see also Estelle*, 429 U.S. at 104–05 ("We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." (internal citation and footnotes omitted)).    If "intentionally interfering with the treatment once prescribed" could constitute a violation of the Eighth Amendment, surely a blanket refusal to be evaluated for treatment could also constitute a claim.

6.

The majority at 14–15 note 8 states no circuit has disagreed with *Kosilek*; however, that does not tell the full story. I am not aware of any circuit that has considered another case regarding SRS which has gone through a full trial, instead of being dismissed at the Rule 12(b)(6) or summary-judgment stages.

*See, e.g., Rosati*, 791 F.3d 1037; *De'lonta v. Johnson*, 708 F.3d 520 (4th Cir. 2013).

As the majority notes, the fourth and ninth circuits have allowed Eighth Amendment claims to survive motions to dismiss for failure to state a claim. *See Maj. Opn.* at 14 note 8 (citing *Rosati*, 791 F.3d at 1040; *De'lonta*, 708 F.3d at 526); *see also De'lonta v. Angelone*, 330 F.3d 630 (4th Cir. 2003) (regarding a request for hormone therapy). In doing so, the fourth and ninth circuits have suggested the failure to provide medical care based on an administrative policy, and not on medical judgment, could constitute deliberate indifference. *See Rosati*, 791 F.3d at 1039–40 (citing *Colwell*, 763 F.3d at 1063 ("holding that the 'blanket, categorical denial of medically indicated surgery solely on the basis of an administrative policy that one eye is good enough for prison inmates is the paradigm of deliberate indifference'")); *De'lonta*, 330 F.3d at 635 ("In fact, [the doctor's] response . . . which states that there was no gender specialist at [the consulting medical facility] and that [the prison's] policy is not to provide hormone therapy to prisoners, supports the inference that [the] refusal to provide hormone treatment to De'lonta *was based solely on the Policy rather than on a medical judgment concerning De'lonta's specific circumstances.*" (emphasis added)).

Nor are the majority's cited cases regarding hormone therapy persuasive, because, as the majority states at 15 note 8, the holdings were limited to *the individual cases*. In *Praylor v. Texas Department of Criminal Justice*, our court held that, "*on [that] record*, the refusal to provide hormone therapy did not constitute the requisite deliberate indifference". 430 F.3d 1208, 1209 (5th Cir. 2005) (emphasis added). In *Supre v. Ricketts*, decided in 1986, the tenth circuit also held the failure to treat the plaintiff with hormone

therapy did not rise to deliberate indifference.  In so holding, the court explained:

> It is apparent *from the record* that there were a variety of options available for the treatment of plaintiff's psychological and physical medical conditions.  It was never established, however, that failing to treat plaintiff with estrogen would constitute deliberate indifference to a serious medical need.  *While the medical community may disagree among themselves as to the best form of treatment for plaintiff's condition*, the [prison] *made an informed judgment* as to the appropriate form of treatment and did not deliberately ignore plaintiff's needs.

792 F.2d 958, 963 (10th Cir. 1986) (emphasis added).

Supre was examined by two endocrinologists and a psychiatrist, each of whom considered estrogen therapy as a course of treatment.  *Id.* at 960.  Two of the doctors advised against hormone therapy because of its dangers and controversial nature at that time.  *Id.*  But, one of the endocrinologists recommended hormone therapy.  *Id.*  The prison made "an informed judgment" based on the recommendations of Supre's doctors, not based on a policy.  *Id.* at 963.

Finally, the majority at 15 note 8 cites *Meriwether v. Faulkner*, decided by the seventh circuit in 1987.  The *Meriwether* court, in allowing the Eighth Amendment claim to survive a motion to dismiss, stated:  "[Plaintiff] does not have a right to any particular type of treatment, such as estrogen therapy . . . ."  821 F.2d 408, 413 (7th Cir. 1987).  In 2011, however, the seventh circuit explained in *Fields v. Smith* that the *Meriwether* language was *dicta*, and held "the evidence at trial indicated that plaintiffs could not be effectively

treated without hormones". 653 F.3d at 555–56. Therefore, the court affirmed the district court's ruling that the Wisconsin statute in question, "which prohibit[ed] the Wisconsin Department of Corrections . . . from providing transgender inmates with certain medical treatments", *id.* at 552, was invalid, both on its face and as applied to plaintiffs, as a violation of the Eighth Amendment, *id.* at 559.

7.

The majority has missed the mark. The question is not whether there is a broad medical controversy, but whether there is a disagreement about the efficacy of the treatment for this particular prisoner, based on this prisoner's individual needs. Obviously, what is not medically necessary for one person, may be medically necessary for another. *See, e.g., Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998) ("Whether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case.").

This fact-specific inquiry required by the Eighth Amendment is exactly why we cannot rely solely on the record in *Kosilek* in determining the medical necessity in Gibson's case, unlike the procedure used in the below-described First Amendment precedent relied on by the majority at 16–17 note 9.

Never mind that the Director did not "borrow from *Kosilek*" as the majority suggests at 16; again, the Director did *not even cite Kosilek* in his summary-judgment motion. Again, in this record, the only evidence of medical necessity is the WPATH Standards of Care. Contrary to the majority's above-noted position at 16 and note 9, the need for individualized medical determinations is obviously different from the general evidence required to show a State's compelling interest in protecting its citizens from corruption of the political system by large campaign contributions or from the secondary

effects caused by a strip club or adult theater.  *See, e.g., Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377 (2000); *City of Erie v. Pap's A.M.*, 529 U.S. 277 (2000); *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986).

Even if the Director had cited *Kosilek* in district court, we are required, at this summary-judgment stage, to view the evidence and draw all reasonable inferences in the light most favorable to the nonmovant—Gibson.  *See Renwick v. PNK Lake Charles, L.L.C.*, 901 F.3d 605, 611 (5th Cir. 2018) (citations omitted).  The testimony in *Kosilek*, coupled with the WPATH Standards of Care, when viewed in the light most favorable to Gibson, demonstrate a genuine dispute of material fact on the medical necessity of SRS in general. And, on this record, we cannot know if SRS is medically necessary for Gibson, because Gibson has been denied the right to an evaluation and the due-process right to make a record on this point of contention.

The majority consistently misconstrues the correct standard.  At 2, the majority quotes *Delaughter*, 909 F.3d at 136, stating:  "'[M]ere disagreement with one's medical treatment is insufficient' to state a claim under the Eighth Amendment."  *See also Maj. Opn.* at 9 (quoting *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997)).  This is correct; "mere disagreement with one's medical treatment is insufficient to show deliberate indifference".  *Delaughter*, 909 F.3d at 136 (citation omitted).

But, the majority at 2 goes on to claim that "[t]his bedrock principle dooms this case" because of the broad medical controversy surrounding SRS. This is incorrect.  A prisoner's mere disagreement with his medical treatment is insufficient to show deliberate indifference when:  the prisoner has, in fact, been evaluated by a medical professional; the medical professional has prescribed a course of treatment; and the prisoner then disagrees with that course of treatment.  *See, e.g., Estelle*, 429 U.S. at 107 (prisoner disagreed with

diagnosis and treatment plan by medical professionals); *Norton*, 122 F.3d at 291–92 & n.1 (prisoner disagreed with medical treatment and asserted prison should have tried alternative methods of treatment or different diagnostic measures, but medical records showed prison officials followed medical treatment prescribed by doctors and afforded prisoner extensive medical care); *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991) (prisoner disagreed with revocation of his "diet card" after medical personnel determined the newly-built ramps in the dining hall made the diet card unnecessary).

Gibson, on the other hand, has been treated for SRS in the form of hormone therapy.  Gibson does not deny that.  Gibson, however, avers the hormone therapy is not adequate and SRS may be medically necessary to treat Gibson's gender dysphoria, and requests an evaluation for SRS.  Ordinarily, the majority would be correct in stating this would not be enough to show deliberate indifference.  But, the difference in this case is that a medical professional ordered Gibson be evaluated for SRS.  This evaluation has never happened because of the prison's ban on SRS, not because of any treatment plan by a medical professional.  *See Maj. Opn.* at 5.

I am not taking a position on whether Gibson's claim constitutes deliberate indifference.  But, the Director's refusal to have Gibson evaluated for SRS, contrary to a medical professional's order and based on a blanket ban, *could* constitute deliberate indifference; and, Gibson should, as a matter of due process, be allowed to conduct discovery and build a record on this claim, including being evaluated by a medical professional to determine the medical necessity of SRS in Gibson's case.

8.

The majority goes to great lengths at 19–23 discussing the text and original understanding of the Eighth Amendment's "cruel and unusual

punishment" standard.  Its analysis is unnecessary; the standard has been long established.   In *Estelle*, the Supreme Court held "that deliberate indifference to serious medial needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment".   429 U.S. at 104 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)); *see, e.g.*, *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006) ("A prison official violates the Eighth Amendment's prohibition against cruel and unusual punishment when his conduct demonstrates deliberate indifference to a prisoner's serious medical needs, constituting an 'unnecessary and wanton infliction of pain.'" (citation omitted)); *Barksdale v. King*, 699 F.2d 744, 748 (5th Cir. 1983) ("'[A]cts or omissions sufficiently harmful to evidence *deliberate indifference to serious medical needs*' of inmates constitute *cruel and unusual punishment*." (alteration in original; second emphasis added) (quoting *Ruiz v. Estelle*, 679 F.2d 1115, 1149 (5th Cir.), *vacated in part by* 688 F.2d 266 (5th Cir. 1982) (this portion of opinion vacated because parties entered into settlement before original opinion issued without disclosing to court)); *Dickson v. Colman*, 569 F.2d 1310, 1311 (5th Cir. 1978) ("The Court [in *Estelle*] held that inadequate medical care did not constitute cruel and unusual punishment cognizable under section 1983 unless the mistreatment rose to the level of 'deliberate indifference to serious medical needs.'" (quoting *Estelle*, 429 U.S. at 106)).

We, therefore, are not at liberty to undertake the text-and-original-understanding analysis.  Instead, we must decide only:  whether the prisoner has a serious medical need (the Director has conceded Gibson does); and, if there is a serious medical need, whether the prison has been deliberately indifferent to that need.  End of analysis.

III.

The inadequate summary-judgment record does not provide any evidence regarding the medical community's current opinion on the necessity of SRS in treating gender dysphoria in general, much less in regard to Gibson; and we cannot base the medical community's standards on evidence submitted in a four-year-old case.  Nor can we depart even further from the record and caselaw to make our own record, ignoring the genuine disputes of material fact at hand.  This case does not call into question the "text [or] original understanding" of the Eighth Amendment, *see Maj. Opn.* at 20; the controlling medical-deliberate-indifference standard for prisoners is well-established. Instead, at issue is fundamental fairness—the right to due process.  Summary judgment was improper; and, therefore, I must respectfully dissent.